772 F.2d 972
 23 ERC 1820, 249 U.S.App.D.C. 54, 15
Envtl. L. Rep. 20,772
 Mario M. CUOMO, Governor of the State of New York and County
of Suffolk, Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents, Long Island
Lighting Co., Intervenor.
 No. 85-1042.
 United States Court of Appeals,
District of Columbia Circuit.
 Order Filed July 3, 1985.
Opinion Filed Sept. 17, 1985.
As Amended Sept. 20, 1985.
 
 Petition for Review of an Order of the Nuclear Regulatory commission
 Herbert H. Brown, Lawrence Coe Lanpher, Washington, D.C., Karla J. Letsche and Robert Abrams, New York City, were on the emergency motion for stay filed by petitioners.
 William H. Briggs, Jr., Solicitor, E. Leo Slaggie, Deputy Solicitor, Herzel H.E. Plaine, Gen. Counsel, Michael B. Blume and Karla D. Smith, Attorneys, Nuclear Regulatory Commission, Washington, D.C., were on the opposition to emergency motion for stay, filed by respondent United States Nuclear Regulatory Commission.
 Donald P. Irwin and Robert M. Rolfe, Richmond, Va., was on the response to emergency motion for stay, filed by intervenor.
 Before WRIGHT, WALD and EDWARDS, Circuit Judges.
 Opinion PER CURIAM.
 
 On Petitioners' Emergency Motion for Stay
 PER CURIAM:
 
 1
 Petitioners, Mario M. Cuomo, Governor of the State of New York, and Suffolk County, seek an emergency stay of a United States Nuclear Regulatory Commission Licensing Board decision, issued June 14, 1985, which authorizes the issuance of a license for low-power testing (up to five percent of rated power) at the Shoreham Nuclear Power Station. We have closely examined the petitioners' contentions, as well as those of the respondents, United States Nuclear Regulatory Commission ("NRC") and United States and intervenor, Long Island Lighting Company ("LILCO"). We conclude that petitioners have not met their burden of showing that exercise of the court's extraordinary injunctive powers is warranted.
 
 
 2
 The factors to be considered in determining whether a stay is warranted are: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay. WMATA v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C.Cir.1977). To justify the granting of a stay, a movant need not always establish a high probability of success on the merits. Probability of success is inversely proportional to the degree of irreparable injury evidenced. A stay may be granted with either a high probability of success and some injury, or vice versa. We summarize our analysis of these factors, as applied to the circumstances of the instant case, as follows.
 
 I. LIKELIHOOD OF SUCCESS OF THE MERITS
 
 3
 Without prejudice to a later contrary showing by petitioners, we conclude that petitioners have failed to make out "a substantial case on the merits." Holiday Tours, 559 F.2d at 843. We concentrate here on only the most significant objections to petitioners' position.
 
 
 4
 In this motion for stay, petitioners confine their argument to the claim that provisions of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. Sec. 4321 et seq., require that the NRC supplement an environmental impact statement ("EIS") prepared in 1977. The essence of petitioners' NEPA argument is that the 1977 EIS did not consider the possibility that the Shoreham plant might never operate at full power. Petitioners further contend that circumstances have dramatically changed since 1977, in that Congress and the NRC now require that an emergency evacuation plan be developed and approved prior to the issuance of a full-power license. See Pub.L. No. 96-295, 94 Stat. 780 (1980); 10 C.F.R. Secs. 50.33(g), 50.47(d) (1984). In addition, petitioners contend that the likelihood that a final operating license will be granted is virtually nil, since both the State of New York and County of Suffolk have refused to participate in the preparation of an emergency evacuation plan. Petitioners, thus, would have the NRC prepare a supplemental EIS to consider the possibility that full-power operation will be denied, and to consider whether alternatives, such as delaying low-power operations until emergency planning issues are resolved, should be undertaken. See Memorandum Supporting Emergency Stay Motion at 28.
 
 
 5
 As with the duty to prepare an initial EIS, the duty to supplement an EIS is governed by a "rule of reason." San Luis Obispo Mothers for Peace v. NRC, 751 F.2d 1287, 1301 (D.C.Cir.1984), vacated in part and rehearing en banc granted on other grounds, 760 F.2d 1320 (D.C.Cir.1985); see Friends of the River v. FERC, 720 F.2d 93, 109 (D.C.Cir.1983) (citing reasonableness standard). In addition, "[g]enerally, the initial decision whether a supplemental EIS is required should be made by the agency, not by a reviewing court." Id. at 108-09.
 
 
 6
 Under this rule of reason, an agency is not required to supplement an EIS when "remote and highly improbable consequences" are alleged. San Luis Obispo Mothers, 751 F.2d at 1300; see Friends of the River, 720 F.2d at 109 (noting that agency need not supplement EIS "every time some new information comes to light"); 40 C.F.R. Sec. 1502.9(c)(1)(ii) (1984) (requiring that agency supplement EIS when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts") (Council on Environmental Quality guideline). Rather, as the Ninth Circuit states the rule:
 
 
 7
 Reasonableness depends on such factors as the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data.
 
 
 8
 Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1024 (9th Cir.1980); see People Against Nuclear Energy v. NRC, 678 F.2d 222, 234 (D.C.Cir.1982) (citing Ninth Circuit statement of rule with approval), rev'd on other grounds sub nom. Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983). Considering each of these factors in turn, it does not appear that the NRC has violated the rule of reason in this case.
 
 
 9
 Petitioners implicitly concede that there are no environmental consequences associated with low-power testing that were not considered in the 1977 EIS. Rather, the heart of petitioners' contention is that, because of the absence of a viable emergency evacuation plan, there is an increased likelihood that the environmental harms of low-power testing will not be balanced by eventual benefits from full-power operation. See Memorandum Supporting Emergency Stay Motion at 32.
 
 
 10
 The accuracy of petitioners' contention that no full-power license will ever be granted, due to the lack of an emergency evacuation plan, is far from indisputable. We note, in this regard, the recent actions of the Suffolk County Executive, suggesting the possibility of County cooperation in an emergency plan. See Suffolk County Exec. Order No. 1-1985 (May 30, 1985). Although this order has apparently been nullified by judicial action, see Order, In re Town of Southampton, No. 85-10520 (N.Y.Sup.Ct. Suffolk County June 10, 1985), aff'd, No. 3004E (N.Y.App.Div., 2d Dep't June 19, 1985), the dispute between the County Executive and Legislature remains, see Letter from Martin Bradley Ashare, Suffolk County Attorney, to Nunzio J. Palladino, Chairman of NRC (June 3, 1985) (indicating that counsel for Suffolk County has been discharged), and will undoubtedly result in additional litigation and political confrontations. Under these circumstances, it is virtually impossible to predict how long the State and County will maintain their opposition to the emergency evacuation plan.
 
 
 11
 The NRC's consideration of petitioners' contention has been neither cursory nor lacking in due process. The NRC has, on three occasions, considered and rejected petitioners' claim. See Memorandum and Order, In re Long Island Lighting Co., Docket No. 50-322-OL (NRC June 24, 1985); Order, In re Long Island Lighting Co., CLI-85-12 (NRC June 20, 1985); In re Long Island Lighting Co., 19 NRC 1323 (June 5, 1984). In one of these orders, moreover, the NRC explicitly determined that, even if some new calculation of the costs and benefits of low-power operation were required, consideration of the contentions advanced by petitioners would not necessitate denial of a low-power license. Order at 4-5, In re Long Island Lighting Co., CLI-85-12 (NRC June 20, 1985).
 
 
 12
 Finally, we conclude that the NRC has adequately supported its conclusion with a statement of reasons and relevant data. The central conclusion in the NRC's orders is that some possibility always exists at the time a low-power license is issued that a final operating license may not be granted. See In re Long Island Lighting Co., 19 NRC 1323, 1327 (June 5, 1984). The NRC points out that the outcome of litigation and political conflicts frequently surrounding the grant of a final license is particularly speculative. Id. If the NRC were required to supplement the EIS for a nuclear power plant every time the risk that a final operating license would not be granted changed, the Commission might find itself forced to continually reevaluate the cost to benefit ratio of various stages of each project. Even if, as the petitioners assert, the NRC is capable of resolving this line-drawing problem by assessing in each case whether there is a substantial likelihood that a final license will not be granted, we do not think that the facts of this case would clearly justify such a conclusion. Moreover, as the NRC notes, see Order at 5, In re Long Island Lighting Co., CLI-85-12 (NRC June 20, 1985), to delay low-power testing while such risks are evaluated could eliminate the benefits--including early detection of problems--of low-power testing under 10 C.F.R. Sec. 50.57(c) (1984), which permits low-power operation prior to the resolution of full-power issues such as emergency evacuation planning.
 
 II. IRREPARABLE INJURY
 
 13
 Petitioners assert that three types of injury may follow from immediate low-power testing. First, petitioners note that low-power testing will result in irradiation of the reactor, an irreversible change from the status quo. Petitioners, however, only vaguely sketch the contours of this asserted harm. Workers will be exposed to some level of radiation during and following the test. Petitioners' Reply Memorandum in Support of Emergency Stay Motion at 37. There also is inevitably some extremely small possibility that radiation could be released into the surrounding environment as a consequence of the test. Id. While it is true that these potential harms, should they occur, cannot be repaired by mere money, their likelihood of occurrence is too small to meet an irreparable harm standard. A party moving for a stay is required to demonstrate that the injury claimed is "both certain and great." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C.Cir.1985).
 
 
 14
 Petitioners' second claim of irreparable harm is the possibility that their claims will be mooted if a stay is not granted. Petitioners do not claim that the propriety of the granting of a lower-power license could not be reviewed even after low-power testing is complete, see Petitioners' Reply Memorandum in Support of Emergency Stay Motion at 39, as well they should not. See San Luis Obispo Mothers for Peace v. NRC, 751 F.2d 1287, 1317 (D.C.Cir.1984) (holding that claims related to low-power hearing do not become moot upon completion of low-power testing), vacated in part and rehearing en banc granted on other grounds, 760 F.2d 1320 (D.C.Cir.1985). Rather, petitioners contend that their claims will become effectively moot if low-power testing is permitted because no effective relief could be granted. See Memorandum Supporting Emergency Stay Motion at 41-42. This argument, however, merely recasts the irreparable injury contention discussed above. No doubt low-power testing represents an irreversible change from the status quo, but the significance of this change does not amount to irreparable harm.
 
 
 15
 Finally, petitioners contend that the potential NEPA violation in this case presumptively justifies a stay. See Memorandum Supporting Emergency Stay Motion at 43. In the ordinary case, "when an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance." Realty Income Trust v. Eckerd, 564 F.2d 447, 456 (D.C.Cir.1977). This, however, is far from the ordinary case. The NEPA violation in this case has not been clearly established, see Part I, supra, as should be done in order to justify injunctive relief. See Realty Income, 564 F.2d at 456 (calling for "particularized analysis" of violations that have occurred). In addition, there is no contention in this case that additional environmental consequences should be considered prior to proceeding with the project. See id. (indicating that the first rationale for injunctions is that "a project should not proceed, with its often irreversible effect on the environment, until the possible adverse consequences are known"). To a lesser extent, the need for an injunction is also undercut by the NRC's stated position that, even after considering the possibility that a full-power license will not be granted, the Commission would still grant a low-power license. See Order at 4-5, In re Long Island Lighting Co., CLI-85-12 (NRC June 20, 1985). While we have cautioned that courts should not prejudge the reconsiderations that agencies may make upon compliance with NEPA, Realty Income, 564 F.2d at 456, where, as here, the agency has already considered the environmental consequences of a proposed action and has explicitly stated that petitioners' proposed recalculation of the cost to benefit ratio would not change its decisions, "the rationale of preserv[ing] for the agency the widest freedom of choice," id., may not justify injunctive relief.
 
 III. HARM TO OTHERS
 
 16
 LILCO, for its part, advances three contentions concerning the harms it may suffer from a delay in low-power testing. As with irreparable harm to the movant, we test these harms for substantiality, likelihood of occurrence and adequacy of proof. See Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C.Cir.1985). On this analysis, we find LILCO's allegations of harm no more conclusive on the need for a stay than the allegations advanced by the petitioners.
 
 
 17
 LILCO first suggests that a delay in testing may deprive the utility of an opportunity for training personnel and for early detection of problems. Response of Long Island Lighting Company to Emergency Stay Motion at 60. While there is unquestionably a theoretical benefit to early testing and training, it apparently is impossible for LILCO to estimate what the level of benefits might be. See Affidavit of John D. Leonard, Jr., at 15 (indicating that major problems are not expected to be revealed from low-power testing but that "the possibility cannot be ignored"). In any event, the benefits of early testing essentially assume that the plant will achieve full-power operation, which, as we discussed in Part I, is a matter for speculation.
 
 
 18
 LILCO next notes that delay may cause the utility to lose valuable personnel and that, in any event, experts brought to the plant to perform low-power testing must be paid for their time during the period that low-power testing is delayed. Response of Long Island Lighting Company to Emergency Stay Motion at 61. The possibility that the utility may lose personnel as a result of delay is wholly unquantified and, apparently, inherently unquantifiable. See Affidavit of John D. Leonard, Jr., at 23 (noting that, if delay caused personnel to leave, "the effect of delay would be increased by an unquantifiable but potentially long period"). The effect of the loss of personnel, moreover, is apparently increased delay of full-power operation. See id. The possibility that full-power operation will ever be achieved is, however, a matter for speculation. The cost of keeping experts hired for low-power testing presents a different problem. LILCO apparently hired these experts in the anticipation that a low-power license would eventually be granted. In making these contracts, LILCO took a risk that a low-power testing license might not be granted or might be delayed. Such self-imposed costs are not properly the subject of inquiry on a motion for stay.
 
 
 19
 LILCO's final argument, that delay will require it to purchase new neutron calibration sources, see Response of Long Island Lighting Company to Emergency Stay Motion at 62, suffers from the same defect as the utility's claim concerning the hiring of experts. This nuclear fuel was purchased in December of 1984, without any assurance that low-power testing would go forward. This, again, is a self-imposed risk.IV. THE PUBLIC INTEREST
 
 
 20
 Of the four factors relevant to a decision on a motion for stay, the calculation of the public interest is perhaps the most difficult:
 
 
 21
 The public interest may, of course, have many faces--favoring at once both the rapid expansion of utilities and the prevention of wasteful and repetitive proceedings at the taxpayers' or consumers' expense; both fostering competition and preserving the economic viability of existing public services; both expediting administrative or judicial action and preserving orderly procedures.
 
 
 22
 Virginia Petroleum Jobbers Association v. FPC, 259 F.2d 921, 925 (D.C.Cir.1958). This calculation is no less difficult in this case.
 
 
 23
 Petitioners' argument concerning the public interest proceeds in three parts: First, the public interest favors maintenance of the status quo. Memorandum Supporting Emergency Stay Motion at 53. Second, the views of the State and the County should be held to represent the public interest. Id. at 54. Third, the harms associated with low-power operation of the plant would directly affect the public living in the area of the Shoreham plant; these are the people who will suffer any environmental or economic costs. Id. at 55. The first and the third of petitioners' arguments may be quickly dispatched, since they essentially rehearse petitioners' arguments about the irreparable harm associated with low-power operation of the plant. Petitioners' second argument, that the State and County views are entitled to substantial deference, is much more difficult. The State and County governments are composed of elected representatives and, in that sense, must be presumed to represent the interests of their constituents. There is, however, another sense by which the public interest should be gauged. Congress, the elected representatives of the entire nation, decreed in the Atomic Energy Act of 1954 and its subsequent amendments that the NRC and its predecessor should be responsible for the "national security, public health, and safety" concerns associated with nuclear power. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 550, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). In any event, petitioners do not contend that their views on the public interest should be considered conclusive. See Petitioners' Reply Memorandum in Support of Emergency Stay Motion at 52.
 
 
 24
 The NRC and LILCO both contend that the dominant public interest concern should be safety. See Respondent United States Nuclear Regulatory Commission's Opposition to Emergency Motion for Stay at 41; Response of Long Island Lighting Company to Emergency Stay Motion at 65-66. These safety considerations, of course, have already been resolved in LILCO's favor by the NRC. To the extent that these safety considerations are not grounds for stay of low-power operation, the NRC further contends, the public interest lies in avoiding delays in the productive use of resources. See Respondent United States Nuclear Regulatory Commission's Opposition to Emergency Motion for Stay at 44. This argument, like those advanced by petitioners, again appears to merely recast the arguments made concerning the second and third factors in the stay analysis (irreparable injury and harm to others), discussed above. It is impossible to say, therefore, that the public interest either strongly favors or disfavors the grant of a stay in this case.
 
 CONCLUSION
 
 25
 On a motion for stay, it is the movant's obligation to justify the court's exercise of such an extraordinary remedy. In this case, the petitioners have failed to establish that they have a substantial case on the merits, and have further failed to demonstrate that the balance of equities or the public interest strongly favors the granting of a stay. For these reasons, the motion for stay is denied.
 
 
 26
 It is so ordered.