LONG ISLAND LIGHTING COMPANY
and the United States of
America, Plaintiffs,

and

Citizens for an Orderly Energy Policy,
Inc. and the Shoreham-Wading River
Central School District, Plaintiff-Intervenors,

v.

The COUNTY OF SUFFOLK, NEW
YORK, a New York Municipal Corporation, and Peter F. Cohalan, in his
Official Capacity as Suffolk County Executive, Defendants,

No. CV 86–0174, CV 86–0355.

United States District Court,
E.D. New York.

Feb. 10, 1986.

Hunton & Williams, by Dennis Sisk, New York City, for plaintiff LILCO.

Raphael Gomez, Richard K. Willard, Asst. Atty. Gen., Washington, D.C., for plaintiff.

Ronald A. Zumbrun, Sam Kazman, and Lucinda Low Swartz, Washington, D.C., for plaintiff-intervenor Citizens for an Orderly Energy Policy, Inc.

Lou Lewis, Poughkeepsie, N.Y., for plaintiff-intervenor Shoreham-Wading River Cent. School Dist.

Martin B. Ashare, Suffolk Co. Atty., Hauppauge, N.Y., Kirkpatrick & Lockhart, by Herbert C. Brown, Lawrence C. Lanpher, and David Brownlee, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

This case is the most recent chapter in a protracted struggle over the future of the nuclear electricity generating facility owned by the Long Island Lighting Company ("LILCO") located in Shoreham, New York (the "Shoreham facility"). LILCO and the United States brought these actions against defendants Suffolk County (the "County") and Peter Cohalan, the Suffolk County Executive, in connection with the County Legislature's recent enactment of Local Law 2-86, a statute that criminalizes participation in a test involving simulation of local government roles. By way of an Order to Show Cause plaintiffs seek a preliminary injunction restraining the County and Cohalan from enforcing Local Law 2-86. A hearing was held on February 6, 1986 and at that time, the Court granted plaintiffs' motions to consolidate the cases. For the reasons stated below, the Court now grants the preliminary injunction.

### PRELIMINARY REMARKS

As the Court sought to make clear at oral argument, there are many things that this case is not. The Court's ruling neither proclaims a renewed faith in nuclear power nor confers a blessing on LILCO or its Shoreham facility. The Court does not decide whether the emergency evacuation plan should be tested, if the Nuclear Regulatory Commission ("NRC") should issue LILCO an operating license, or if Shoreham should be opened. These questions, along with the broader issues of the use of nuclear power and the future of the nation's public utilities, are beyond the purview of the Court. The Court does not address them today and given the constitutional limits on judicial power, these truly weighty controversies will not be resolved by this or any other federal court.

To avoid any ambiguity, the narrow question before this Court is whether the acts made criminal by Suffolk County under Local Law 2–86 intrude into a sphere reserved exclusively to the federal government. Congress requires that federal judges reside in the judicial district in which they sit, 28 U.S.C. § 134(b). Therefore, this Court cannot help but observe the deep passions and seemingly intractable problems that infect the controversy over the Shoreham nuclear power plant. The criticism of the Shoreham facility has become a password for a spate of economic, political and public health concerns confronting the County, New York State, and the United States. But those issues are not before the Court, and the Court cannot reach out and decide them. Today's ruling will neither make them disappear nor advance their resolution.

## BACKGROUND

A. *Suffolk County and Radiological Emergency Planning*

LILCO first applied to the Atomic Energy Commission ("AEC") in 1968 for a license to construct the Shoreham facility. Although Suffolk County did not choose to participate in the initial licensing proceedings, then Suffolk County Executive H. Lee Dennison appeared before the AEC Licensing Board in 1970 and spoke in favor of a construction permit. The only local group to oppose the issuance of a construction license at that time was the Lloyd Harbor Study Group. NRC regulations do not require state or local approval, but local governments may intervene in the NRC proceedings. 10 C.F.R. § 2.714 (1985). LILCO received a construction permit in April 1973 and Suffolk County, in close cooperation with LILCO, began to develop a plan to deal with a major radiological accident. Throughout 1975, LILCO and the Suffolk County Planning Department worked closely to define the role that each would play and, ultimately this labor produced a document known as "Suffolk County's General Radiation Emergency Plan."

This plan was approved by the Suffolk County Executive in August 1978.

In March 1979, the accident at Pennsylvania's Three Mile Island nuclear facility changed the nation's attitude toward nuclear power and safety. Within a short time, localities no longer welcomed nuclear power plants and began to question their value and desirability. After Three Mile Island, Congress passed the 1980 NRC Authorization Act, Pub.L.No. 96–295, 94 Stat. 780 (1980), which required, among other things, an adequate radiological emergency response plan ("RERP" or "Plan") for the area surrounding a nuclear power plant before the NRC could license a nuclear power plant. Suffolk County and LILCO continued to work closely, with their efforts now directed toward developing a RERP that would be acceptable to the NRC. To that end, the County entered into a contract with LILCO in 1981 which provided that the County's Planning Department would prepare an off-site emergency plan for the soon-to-be-completed Shoreham facility. In 1982, however, because of an apparent conflict of interest with LILCO in pending NRC proceedings, Suffolk County rescinded the agreement with LILCO and returned any consideration.

Nevertheless, the County continued its emergency planning and sought to develop its own RERP. Accordingly, the County Planning Department submitted a proposal in December 1982. The County Legislature held a number of public hearings on the plan, conducted a number of technical investigations, and generally expended a great deal of time and money in an effort to evaluate the potential impact of a radiological emergency on public health and safety.

In Resolution III–1983, however, the County Legislature decided that no plan would protect the safety of Suffolk County's residents in the event of a radiological disaster and declined to approve the Planning Department's proposal. Accordingly, the County Legislature terminated any further emergency planning and resolved not to participate in the development, approval,

or implementation of any RERP. With construction of the Shoreham facility nearly complete, the County withdrew its support for LILCO's power plant. Subsequently, in Resolution 1398–1984, the County Legislature went on record as both opposing the licensing or operation of the Shoreham facility and advocating its complete abandonment.

From this point onward, Suffolk County opposed the completion of the Shoreham facility before the NRC, and in the federal and state courts. Not surprisingly, there has been a fair amount of litigation over LILCO's Plan and Suffolk County's refusal to participate in the creation and implementation of a RERP. In 1982, Suffolk County commenced a class action in federal court on behalf of county residents to enjoin the completion of the Shoreham facility. Judge Bartels dismissed the County's complaint, holding that federal law preempted state law in the area of radiological safety and therefore, a private litigant has no cause of action under the Atomic Energy Act, Pub. L.No. 585, 60 Stat. 755 (1946), codified as amended at 42 U.S.C. § 2011–282 (1985), to prevent the construction of a nuclear power plant. *County of Suffolk v. Long Island Lighting Company*, 554 F.Supp. 399 (E.D.N.Y.1983), *aff'd*, 728 F.2d 52 (2d Cir. 1984). In its affirmance of the District Court, the United States Court of Appeals for the Second Circuit observed that Suffolk County's "only avenue ... is to continue its proceedings in the administrative forum—the NRC for safety-related concerns and the New York State Public Service Commission for economic claims." 728 F.2d at 64.

In another action, commenced shortly after the County's Resolution III–1983, plaintiff Citizens for an Orderly Energy Policy and plaintiff-intervenors LILCO and the Shoreham-Wading River Central School District sought equitable relief that would have compelled Suffolk County and Peter Cohalan's participation in the development of RERP. After a thorough and detailed examination of the complex legislative history of the 1980 NRC Authorization Act, then District Court Judge Altimari held that

Suffolk County's Resolution III–1983, by which the County withdrew from the emergency planning process and declared Shoreham unsafe, did not amount to a regulation of or interference with the federal government's exclusive power to regulate matters of nuclear power production or radiological safety. *Citizens for an Orderly Energy Policy v. Suffolk County*, 604 F.Supp. 1084, 1094 (E.D.N.Y.1985). Judge Altimari concluded that the eventuality of local nonparticipation had been considered by Congress and that Congress had restructured the law to enable the NRC to continue evaluating emergency plans and granting licenses even in the absence of local governmental input. *Citizens*, 604 F.Supp. at 1095. The Court noted that the result would be different if Suffolk County engaged in some affirmative action amounting to a regulation of nuclear power or a moratorium on plant operation. 604 F.Supp. at 1094 & n. 1.

## B. 1985 TO DATE

Events accelerated as the Shoreham facility reached completion in 1985. As constructed, the Shoreham facility will generate 809 megawatts. The Shoreham facility has been finished for over a year and the total cost now approaches $4.5 billion. LILCO maintains that the carrying charges for the facility are approximately $1.5 million per day or $45 to $55 million per month. Affidavit of John Weismantle, LILCO Vice-President of Engineering, ¶ 18.

Over the County's opposition, the NRC issued a low-power testing license to LILCO in July 1985. Low-power testing commenced and was completed in October. *See Cuomo v. United States Nuclear Regulatory Commission*, 772 F.2d 972 (D.C. Cir.1985). The NRC requires that each utility submit an acceptable RERP before a full power operating license can be issued. 10 C.F.R. § 50.47. If the NRC approves the RERP, a license is issued and the utility can begin operation of the nuclear power plant. Under NRC regulations, the NRC must determine whether the RERP "pro-

vides reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency." 10 C.F.R. § 50.47(a)(2), (b)(14) (1985). As a means of evaluating the adequacy of a RERP the NRC requires that the utility conduct a satisfactory exercise of its Plan. 10 C.F.R. § 50.47(a) (1985).

Despite Suffolk County's decision not to participate in the creation of a RERP, LILCO developed one on its own. This RERP, which the Court has not seen but apparently spans several thousand pages and is contained in several volumes, was submitted to the NRC for approval. The off-site portion of the RERP, which is the focus of this litigation, involves first, an evaluation of the size, characteristics, and distribution of the populations to be protected in the event of a radiological emergency, second, the means available to protect the population, and third, the logistical requirements for the task.

A brief digression will explain the procedures usually followed in evaluating a utility's RERP. The overall review of the state of preparedness, including LILCO's RERP, is conducted by the Federal Emergency Management Agency ("FEMA"). Executive Order 12,148, 44 Fed.Reg. 43239 (July 20, 1979). FEMA reviews LILCO's off-site Plan and reports the results of the review to the NRC. FEMA then arranges, at the request of the NRC, a graded exercise of the ability of various organizations to implement the RERP. FEMA oversees the conduct of the exercise and again reports the results to the NRC. Although FEMA's report constitutes a rebuttable presumption of validity, the NRC has the ultimate responsibility for determining the adequacy of a utility's RERP when either issuing a license or allowing a license to remain in effect. 10 C.F.R. § 50.47(a) (1985). As with any other licensing issue, emergency planning and, specifically, the results of a FEMA-sponsored evaluation of LILCO's RERP, may be litigated before the NRC and appealed to the federal courts. 42 U.S.C. § 2231–42.

Returning to the facts of this case, in November 1984, LILCO notified the NRC that it was planning to test its Plan in February 1985. New York Governor Mario Cuomo, Suffolk County, and the Town of Southampton commenced a suit in New York State Supreme Court, Suffolk County in an effort to prevent the test. The plaintiffs sought a declaratory judgment that LILCO lacked the legal authority to conduct the test. In a lengthy decision dated February 20, 1985, the state court ruled that LILCO, as a private corporation authorized pursuant to state law, lacked the authority to perform the public functions that are traditionally reserved to state and local governments, *Cuomo v. LILCO*, No. 84–4615 (N.Y.Sup.Ct. Suffolk Cty. Feb. 20, 1985). That court granted plaintiffs' motion for partial declaratory judgment.

Despite this decision, the NRC declared on June 4, 1985 that it saw "no reason why [LILCO] should not be allowed to exercise those parts of the plan which it may legally exercise." Letter from Samuel J. Chilk, NRC Secretary to William. J. Dircks, NRC Executive Director for Operations (June 4, 1985). Although the NRC realized that the state court's decision in *Cuomo* could prevent a full exercise of the Plan, a test could "yield meaningful results, even though such an exercise may not satisfy all of the requirements of NRC's regulations." *Id.* FEMA was informed of the NRC's decision and in October 1985, FEMA informed the NRC that it would be able to conduct a test of LILCO's Plan. FEMA's representative responded, however, that the non-participation of state and local governments, a situation "dramatically different" from other New York test sites, "would not allow us [FEMA] sufficient demonstration to reach a finding of reasonable assurance." Letter from Samuel Speck, FEMA, to William Dircks, NRC Executive Director for Operations (October 29, 1985). Mr. Speck stated, however, that this would not preclude the conduct of an exercise and that FEMA's report would be valuable to the NRC in its licensing decision. Mr. Speck concluded that an exercise could be conducted in mid-January 1986, but, in the

event of a delay, another test could not be scheduled for at least 90 days. *Id.* Both Suffolk County and New York State indicated their opposition to the test. In early December, FEMA declared its intention to conduct a test of LILCO's Plan on February 13, 1986.

## C. LOCAL LAW 2–86

On December 23, 1985, the Suffolk County Legislature introduced and passed Resolution 1255–1985, which adopted Local Law 2–86. That law is the subject of this litigation. Section 2 makes it a crime, punishable by both fine and imprisonment,

(a) ...[F]or any person to conduct or participate in any test or exercise of any response to a natural or man-made emergency situation if that test or exercise includes as part thereof that the roles or governmental functions of any Suffolk County official will be performed or simulated, and if the Suffolk County Legislature, pursuant to the procedures set forth in Section 3 and 4 of this law, has issued via resolution a notice of disapproval of such performance or simulation of County roles or governmental function [or]

(b) ...[F]or any person to conduct or participate in any test or exercise of any response to a natural or man-made emergency situation if that test or exercise includes as part thereof that the roles or governmental functions of any Suffolk County official will be performed or simulated, and if the person shall have failed to comply with the procedures set forth in Sections 3(a) and 3(b) of this Local Law.

Local Law 2–86 § 2(a), (b) (enacted Dec. 23, 1985, approved January 13, 1986). Section 3 of the Local Law sets out the procedures that a person must follow in order to obtain the approval of the County Legislature. At least twenty-five days before any proposed test, an applicant must submit to the Legislature a description of the proposed test. The Legislature shall review the submission, convene a public hearing, and "shall determine ... whether the proposed

performance or simulation of County roles or governmental functions constitutes an interference with the public's use of or access to public property, or unauthorized performance of governmental functions, or a usurpation or other impairment of the County's police powers...." Local Law 2–86 § 3(e). If the Legislature disapproves of a proposed test, the Clerk will transmit the notice of disapproval to the applicant. Violation of the Local Law is a Class A misdemeanor punishable by both one (1) year in prison and a fine of one thousand dollars ($1,000.00).

By Resolution 1255–1985, which adopted the Local Law, the Legislature took cognizance of LILCO's Plan and the impending test. The Resolution stated in part that:

WHEREAS, the County of Suffolk has not been informed of what roles and governmental functions of the County would be so performed or "simulated," what actions would be taken by persons carrying out the test, and what public roadways, lands, and other property would be affected during such test; and WHEREAS, the County of Suffolk finds that it would be inconsistent with its police powers and its duty to prevent such powers from being usurped if it were to remain indifferent to usurpation of its police powers or to allow unauthorized persons to perform or simulate the County's roles or governmental functions....

Resolution 1255–1985 (adopted Dec. 23, 1985).

LILCO opposed the passage of Local Law 2–86, but to date it has complied with all of the provisions. Although the record before the Court is not complete, it appears that LILCO applied to the Legislature for approval of the February 13 test and supplied additional information to the County Legislature. The County Legislature convened on February 5 to consider LILCO's application, and on February 7, 1985, issued a resolution of disapproval. The resolution made clear that the Local Law would apply only to LILCO employees and not federal officials.

At approximately the same time, the NRC had before it LILCO's request to conduct a test of the RERP. On December 26, 1985, just three days after Suffolk County enacted Local Law 2–86, New York State, the County, and the Town of Southampton jointly asked the NRC to cancel the scheduled February 13 exercise. In a 3 to 2 decision dated January 30, 1986, the NRC denied the request. The NRC decided the exercise would be useful in determining whether LILCO's Plan should be approved and that the simulation would test an important aspect of LILCO's RERP. The NRC found that the test was "both lawful and necessary to fulfill our responsibility under the Atomic Energy Act to protect the health and safety of the public." *In re Long Island Lighting Company (Shoreham Nuclear Power Station)* (Docket No. 50–32202 Order of January 30, 1986) (footnote omitted). The NRC concluded the order by declaring:

> For the past several years the State, County, and Town have been claiming that no adequate plan can be developed for Shoreham, and that the LILCO plan is inadequate. They are entitled, as litigants before us, to advocate that position; they are not, however, entitled to obstruct our inquiry into the facts necessary to enable us to resolve that assertion.

The NRC was aware of the passage of Local Law 2–86, but, because it was not raised in the proceedings, it was not considered.

On January 16, 1986 LILCO commenced this action, seeking declaratory and equitable relief, as well as money damages. In its Complaint, LILCO alleges, among other things, that Local Law 2–86 is a violation of the Supremacy Clause, the Due Process Clause, and the first, fifth, and fourteenth amendments of the United States Constitution. LILCO also alleges that Local Law 2–86 contravenes state law. LILCO moves for a preliminary injunction, Fed.R.Civ.P. 65, and defendants cross-move for dismissal for failure to state a claim. Fed.R.Civ.P. 12(b)(6).

It comes as no surprise that the NRC and FEMA have monitored these developments closely and sought to resolve the controversy in order to avoid a direct confrontation with Suffolk County. In a letter to County Executive Cohalan dated January 22, 1986, officials of both the NRC and FEMA sought to allay the County's fears about the possible usurpation of County functions. The officials explained that no federal personnel or LILCO employee would be performing a state or local function, although federal officials would play the roles of certain local officials. They explained further that FEMA would observe LILCO's response to a hypothetical radiological emergency and that there would not be any actual performance of state or local functions, interaction with the public, or any interference with normal, daily activities. Letter to Peter Cohalan from Herzel Plaine, NRC General Counsel, and George Watson, FEMA Acting General Counsel (January 22, 1986). At the same time, the Justice Department sent a similar letter to Cohalan and requested that the Justice Department be informed as to whether any federal personnel would be subject to criminal penalties if they participated in the test. Letter from Richard Willard, Assistant Attorney General, to Peter Cohalan (January 23, 1986). The County Legislature's Presiding Officer responded with the information that the Legislature would not vote on the issue of disapproval until February 7. Letter from Gregory Blass, Presiding Officer, Suffolk County Legislature, to Richard Willard (January 30, 1986). Unable to wait until that date, the United States commenced its action against Suffolk County and County Executive Cohalan on February 4, one hour before the Court's scheduled hearing on LILCO's application for a preliminary injunction. Upon oral motion, the Court consolidated the two lawsuits.

## DISCUSSION

It is well-settled in this Circuit that a Court may grant a preliminary injunction upon a showing of (a) irreparable harm and

(b) either (1) a demonstrated likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir.1973).

### A. IRREPARABLE HARM

■ After a careful consideration of the facts in this case the Court concludes that LILCO is faced with irreparable harm if preliminary relief is not granted. If the test scheduled for February 13 does not proceed, then at least 90 days will pass before another test can be scheduled, a delay that will cost LILCO at least $100 million and possibly as much as $165 million if, as LILCO alleges, the carrying charges are $55 million a month. Planning and execution of the test necessitate the participation of more than 1800 LILCO employees. According to LILCO, "Rescheduling the exercise would require cancellation and rescheduling of extensive logistical arrangements, such as insuring availability of federal exercise controllers and observers, verifying availability of facilities, and insuring that support organizations are available to participate." Weismantle Affidavit, ¶ 7. LILCO also asserts that a postponement of the test will necessarily delay LILCO's efforts to obtain a full-power operating license for the Shoreham facility. Without the electrical generating capacity of the Shoreham plant, LILCO may be unable to meet the projected summer 1986 demand for electricity and therefore fail to maintain its generating reserve requirements. *Id.*, ¶ 18. If LILCO chooses to proceed with the FEMA exercise in the face of Local Law 2–86, then its employees would face potential criminal liability, including fines and imprisonment. If LILCO decides to cancel the test, the NRC would have no choice but to deny LILCO's application for a license. Shoreham would then lie dormant and LILCO would be forced to absorb the cost of Shoreham while looking elsewhere for electric power.

As a public utility and a private corporation, LILCO may look for financial relief only to its stockholders and, with the consent of the New York State Public Service Commission, to its ratepayers. LILCO's losses must be borne ultimately by one of these two groups, and the Court takes judicial notice of the resistance by both groups to the rising costs of the Shoreham facility, LILCO's financial difficulties, and one of the highest rates per kilowatt/hour charged by any public utility in the United States. While the harm posed by LILCO's inability to test its RERP is largely economic, it is of such huge proportions as to threaten harm that cannot be adequately compensated after the fact by money damages. It is well settled that an act threatening the destruction of an on-going business concern constitutes irreparable harm. *John B. Hull, Inc. v. Waterbury Petroleum Products Inc.*, 588 F.2d 24 (2d Cir. 1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir.1970); *Janmort Leasing, Inc. v. Econo-Car International Inc.*, 475 F.Supp. 1282 (E.D.N.Y.1979). *Newport Tire & Rubber Company v. Battery*, 504 F.Supp. 143 (E.D.N.Y.1980). Furthermore, because LILCO is a public utility, the prospect of enormous economic injury poses the specter of higher costs and reduced services for all of Long Island's three million residents.

### B. LIKELIHOOD OF SUCCESS ON THE MERITS

Although LILCO has advanced a number of grounds on which this Court can invalidate Local Law 2–86, the parties agree that the overwhelming focus of this lawsuit is the issue of federal preemption, *i.e.*, the extent that federal law displaces state law under the Supremacy Clause. U.S. Const., art. VI, cl. 2. At its core, this case requires an inquiry into the nature of the relationship between the federal and state governments. Unfortunately, the expedited nature of these proceedings does not allow this Court to address these complex issues with the fullness that they deserve, and the

Court will not attempt today to reiterate what has been articulated elsewhere. The Court merely observes that since Suffolk County decided to oppose the operation of the Shoreham facility, the disputes before this Court are reduced to essentially one question, namely, whether the acts of the Suffolk County Legislature constitute an impermissible interference with the federal government's monopoly in the regulation of nuclear safety. *See Citizens,* 604 F.Supp. at 1096; *Suffolk v. LILCO,* 554 F.Supp. 399 (E.D.N.Y.1983). If the Local Law is a regulation of nuclear safety or an interference with federal policy in the area of nuclear safety, then the local Law is preempted under the Supremacy Clause.

 In both *Pacific Gas & Electric Company,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), and *Silkwood v. Kerr-McGee Corporation,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), the United States Supreme Court addressed at length the extent to which the Atomic Energy Act and other federal statutes preempt state power. These cases employed longstanding constitutional standards of preemption, *see Ray v. Atlantic Richfield,* 435 U.S. 151, 156, 98 S.Ct. 988, 993, 55 L.Ed.2d 179 (1978); *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Rice v. Sante Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), from which this Court derives the following principles. Congress may preempt the state's power in a particular area by a "clear and manifest" statement to that effect. *Ray v. Atlantic Richfield,* 435 U.S. at 157, 98 S.Ct. at 994. If Congress demonstrates an intent to occupy an entire field, then any state law falling within that field is preempted expressly. *Silkwood v. Kerr-McGee,* 464 U.S. at 248, 104 S.Ct. at 621. If Congress has not entirely displaced state regulation over the area, state law is still preempted impliedly (a) to the extent it actually conflicts with federal law, *i.e.,* when it is impossible to comply with both federal and state law, or (b) where the state law stands as an ob-

stacle to the accomplishment of the full purposes and objectives of Congress. *Silkwood,* 464 U.S. at 248, 104 S.Ct. at 621 (citations omitted).

In *Pacific Gas & Electric,* the Court held that a California state law that imposed a moratorium on the certification of new nuclear power plants until the state found that there was an acceptable means of nuclear waste disposal was not preempted by federal law. In tracing the legislative history of the Atomic Energy Act, the Court noted that the federal government had, at one time, wholly occupied the field of nuclear power. Because Congress later decided to encourage the use of nuclear energy as a means of generating electricity, an elaborate regulatory structure was created to enable the federal government to oversee and assist in the development of nuclear power plants. The Court concluded that the federal government regulated all matters concerning radiological safety while the states would retain their traditional authority in the areas of "need, reliability, cost, and other related state concerns." *Pacific Gas & Electric,* 461 U.S. at 205, 103 S.Ct. at 1723.

Although, as the Court noted, public utilities are historically governed solely by the states, the equation changes drastically when public utilities substitute nuclear power plants for the more common oil or coal-fired power plants. The federal government's historic role as the force behind the discovery and utilization of nuclear power gives it a longstanding monopoly over all matters nuclear. It was not until 1954, when Congress amended the Atomic Energy Act, that parties other than the federal government were allowed to participate in the use of nuclear power. Even so, the 1954 amendments still mandated extensive federal supervision over the licensing, construction, ownership, and operation of nuclear power plants.

The 1959 amendments to the Atomic Energy Act further delineated the relative spheres of influence. The federal government reserves to itself matters of national

security, public health, and safety in the utilization of nuclear energy and has delegated much of its authority to the NRC. *Pacific Gas & Electric*, 461 U.S. at 206, 103 S.Ct. at 1724 (citing *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 550, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1977)). As the Court observed, the legislative history indicates that the states may regulate the economics of nuclear power plants. Section 274(k) of the 1959 amendments, 42 U.S.C. § 2021(k), also outlines the powers accorded the states and those retained by the federal government. It states in full that "[n]othing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards." 42 U.S.C. § 2021(k) (1985). This subsection, which has been construed by the Supreme Court as a limit on the preemptive effect of the Atomic Energy Act, indicates that Congress sought to preserve matters of radiological safety to the federal government. *Pacific Gas & Electric*, 461 U.S. at 209–10, 103 S.Ct. at 1725.

A closer scrutiny of the history of § 274(k) reveals that earlier versions of the bill envisioned a wider role for the states in the regulation of radiation hazards. The AEC took the position that any state or local authority over the area of radiation hazards was preempted unless the AEC entered into an agreement with the state, and in which case the state or locality was preempted only to the extent specified in any such agreement. Letter from A.R. Luedecke, AEC General Manager, to Sen. Anderson, Chairman of the Joint Committee on Atomic Energy (August 26, 1959), *reprinted in part in* Murphy & LaPierre, *Nuclear "Moratorium" Legislation in the States and the Supremacy Clause: A Case of Express Preemption*, 76 Colum.L. Rev. 392, 404 & n. 69. *See* 42 U.S.C. § 2021(b) (authorizing the NRC to enter into agreements with states providing for the discontinuance of federal regulatory authority). Congress adopted the AEC's position and altered the language to remove any state role, leaving the NRC with

exclusive control over radiation hazards. Murphy & LaPierre, 76 Colum.L.Rev. at 405. Significantly, the AEC's view also included the statement, "Our sole purpose was to leave room for the courts to determine the applicability of particular state laws and regulations dealing with matters on the fringes of the preempted area...." *Id.* at 404 n. 69.

The 1965 amendments to the Atomic Energy Act also demonstrate Congress' intention to keep matters of radiological safety well within the federal sphere of authority. Shortly after the decision of the Ninth Circuit in *Maun v. United States*, 347 F.2d 970 (9th Cir.1965), upholding a local town's authority to impede the Justice Department's acquisition of local transmission lines, Congress amended the Atomic Energy Act explicitly to overturn the Ninth Circuit's decision. The legislative materials accompanying the amendment of § 271 of the Atomic Energy Act, 42 U.S.C. § 2018, make clear that "state and local regulation is permitted only in regard to the rates and services of electric power produced in nuclear facilities. It does not extend to the protection of public health and safety from the special hazards associated with nuclear facilities." Murphy & LaPierre, 76 Colum.L.Rev. at 408 & nn. 91–93; *see Pacific Gas & Electric*, 461 U.S. at 211, 103 S.Ct. at 1726. The Supreme Court has stated that its decision in *Northern States Power v. Minnesota*, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), *aff'g mem.*, 447 F.2d 1143 (8th Cir.1971), is fully consistent with this reading of the statute and congressional intent. *Pacific Gas & Electric*, 461 U.S. at 212, n. 24, 103 S.Ct. at 1726 n. 24.

In *Silkwood*, the Supreme Court clarified the role of the federal government when it held that federal law did not preempt the application of state tort law to the issue of punitive damages. 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). That case, which concededly has little bearing on the instant case, dealt primarily with the problem of remedies and the effect of the Price-

Anderson Act, Pub.L. 85–256, 71 Stat. 576 (1957).

All the parties in this case agree that the legislative history is unenlightening on the question of whether a test of the off-site portion of a public utility's RERP is preempted. The Court's own research reveals that in 1980, after the accident at Three Mile Island, Congress amended the Atomic Energy Act to require that "every nuclear power plant will have applicable to it a state emergency response plan that provides reasonable assurance that the public health and safety will not be endangered in the event of an emergency at such plant requiring protective action." H.R. Rep. 1070, 96th Cong., 2d Sess. 28 (1980), *reprinted in* 1980 U.S. Code Cong. & Ad. News 2216, 2271. Congress clearly anticipated that the public furor over Three Mile Island could cause states and localities to withdraw from the development of nuclear power plants, but that this withdrawal should not act as a penalty against or veto of the local utility's undertaking. The compromise fashioned by Congress enabled the NRC to issue a license even if the utility had the sole responsibility for the development of an emergency response plan. *Id.* Congress has not deviated from this position and, in 1984, when Congress considered the issue of NRC authorizations, the Senate Committee on Environment and Public Works stated that "[t]he Committee reiterates that the adoption of [the 1980 NRC Authorization Act was] intended to reconfirm the authority of the NRC and FEMA to evaluate an emergency preparedness plan submitted by an applicant or licensee...." S.Rep. 546, 98th Cong., 2d Sess. 14 (1984). In his supplemental views on the Authorization Bill, Senator Simpson defined the role Congress created for the federal government thusly:

> With the adoption of section 108, this Committee has now made it clear in three successive NRC authorization bills that it is not our intention to allow a state or locality to prevent a completed facility from operating by refusing to prepare an emergency preparedness plan. It necessarily follows that the

Committee did not intend to allow such governmental entities to accomplish the same result by refusing to participate in the exercise or implementation of an otherwise acceptable emergency plan. To accept such a situation would be to completely frustrate this thrice-stated authority and to ignore various other existing federal emergency response responsibilities and authorities that will, if exercised, enable the NRC and FEMA to avoid such an unfortunate and unintended result.

*Id.* at 22 (supplemental views of Sen. Simpson).

■ From this examination of the legislative history, the Court concludes that Congress did not consider explicitly the possibility that a local government would attempt to block a test of a RERP by requiring the utility to submit the test for approval and by imposing criminal sanctions on the utility's employees if the test proceeded in the face of local governments disapproval. It is manifestly clear from an examination of the legislative history, however, that Congress by no means intended to allow local governments to frustrate or impede the NRC's ability to evaluate a utility's RERP, either passively, through non-acquiesence, or actively, through a prohibition such as Local Law 2–86. This conclusion is consistent with this Court's prior reading of congressional intent. *See Citizens,* 604 F.Supp. 1094 & n. 1.

■ Turning to the facts of this case, the Court is presented with an implied preemption of state law by the federal government rather than an express preemption. Nevertheless, this Court concludes that off-site testing is a necessary element of the NRC's statutory mandate to evaluate an emergency evacuation plan. Emergency planning for radiological hazards in the event of a nuclear power plant accident, as the legislative history demonstrates, is well within the sphere of authority reserved for the federal government by Congress. Federal law encourages but does not require the states and localities to participate in

emergency planning. Congress requires that the NRC, in conjunction with FEMA, will scrutinize any emergency evacuation plan rigorously, regardless of whether it is submitted by the state or by the utility. The NRC has therefore established procedures that will enable it to evaluate a RERP, and off-site testing has been made part of those procedures. The exercise scheduled for February 13 will test LILCO's ability to discover, evaluate, and respond to a major radiological emergency. The NRC has indicated that it expects the off-site test to yield information that will be essential to the NRC's determination of whether LILCO's RERP will provide, in the words of Congress, "reasonable assurance that the issuance of an operating license that public health and safety is not endangered by the operation of the facility." H.Conf.Rep. 1070, 96th Cong., 2d Sess., U.S.Code Cong. & Admin.News 1980, 2270 (1980). The test is not an abstract exercise meant to evaluate LILCO's efficiency or reliability as a public utility. It is geared to determine whether LILCO can respond adequately in the event of a major radiological disaster at the Shoreham facility. Therefore, the Court concludes that off-site testing of a utility's RERP is within the sphere of activities preempted by federal law.

Having determined that protection against radiological hazards, and specifically off-site testing of the RERP, is an area that can be regulated only by federal government, the Court now turns to the issue of whether Local Law 2–86 impermissibly interferes with a preempted federal area. After a thorough examination of all the evidence, this Court concludes that it does so interfere. First, Local Law 2–86 could have the effect of preventing the February 13 test, because LILCO employees could be punished criminally if they participate. Although it is not clear if anyone would indeed be arrested, in its February 4 resolution of disapproval, the County Legislature indicated that it considered LILCO and its employees subject to the criminal sanctions of Local Law 2–86. In the Court's view, there is hardly any more effective way to interfere with an activity than to arrest the participants and subject them to criminal prosecution. If, on the other hand, the threat of criminal prosecution persuades LILCO to cancel or abort the test, then Local Law 2–86 will have successfully obstructed an area preempted by federal law because FEMA and the NRC would not be able to evaluate LILCO's ability to implement the RERP. In sum, if the enforcement or specter of Local Law 2–86 prevents LILCO from participating in the test, then Suffolk County will have impeded the NRC's fact gathering and licensing authority under the Atomic Energy Act.

Second, by failing to articulate a nonsafety rationale, Suffolk County impermissibly intruded into a federally preempted area when it enacted Local Law 2–86. Although the federal government reserved to itself areas of safety and left to the states matters of economics such as rate-making, need, reliability, etcetera, the division between federal and state spheres of authority in the area of nuclear power plants is not amenable to a bright line test.

After an examination of the history of Local Law 2–86, the Court concludes that Local Law 2–86 does not proffer an economic rationale for its enactment. Nowhere in either Resolution 1255–1985 or the February 7 resolution of disapproval does the County speak of economic concerns. Instead, the legislation refers broadly to "police powers" that are exercised by the County in both natural and man-made emergencies. The County's stated concern is that LILCO, a private entity, will usurp the County's police power by "simulating" or "performing" County functions during the test of LILCO's emergency plan. The County is on record, however, since Resolution 111–1983, as opposing the opening of the Shoreham facility on the grounds that no emergency evacuation plan is safe for Suffolk County. Indeed, the County's refusal to participate in the creation of a RERP was based on the County's independent determination that Shoreham was not safe. The County's attempt

to stop the February 13 exercise on the grounds that LILCO will be usurping the County's police powers is of a piece with the County's 1983 determination that Shoreham should be abandoned as unsafe. Because the County passed Local Law 2–86 in an attempt to continue its opposition to the Shoreham facility on the basis of a perceived radiological hazard, this Court concludes that Suffolk County has impermissibly intruded into a sphere of authority reserved exclusively to the federal government by Congress.

The County argues that the plaintiff's motion must be denied in light of the Supreme Court's holding in *Pacific Gas & Electric.* The Court disagrees. The California statute at issue in *Pacific Gas & Electric* bears little resemblance to the statute under consideration here. As LILCO's counsel pointed out at oral argument, *Pacific Gas & Electric* dealt with pre-construction regulation of nuclear power plants and the disposal of nuclear byproducts. In this case, by contrast, the County is opposing a federally-sponsored test of LILCO's RERP after the Shoreham facility has been completed. The pre-construction moratorium litigated in *Pacific Gas & Electric* fell within the state sphere of authority. As the Supreme Court observed:

> A state moratorium on nuclear construction grounded in safety concerns falls squarely within the prohibited field. Moreover, a state judgment that nuclear power is not safe enough to be further developed would conflict directly with the countervailing judgment of the NRC, that nuclear construction may proceed notwithstanding extant uncertainties as to waste disposal. A state prohibition on nuclear construction for safety reasons would also be in the teeth of the Atomic Energy Act's objective to insure that nuclear technology be safe enough for widespread development and use and would be pre-empted for that reason.

*Pacific Gas & Electric,* 461 U.S. at 213, 102 S.Ct. at 1727 (citations omitted). This case is unlike *Pacific Gas & Electric* because the County is interfering with the NRC's post-construction licensing process. Nor is it clear that the County has advanced a non-safety rationale for Local Law 2–86. The Court also concludes that the decision of the New York State Supreme Court in *Cuomo v. LILCO* has little application here because that decision was based on state law grounds.

In so ruling, this Court is not acting inconsistently with the prior decision of this Court in *Citizens for an Orderly Energy Policy v. Suffolk County,* 604 F.Supp. 1084 (E.D.N.Y.1985). States and localities are not required to develop emergency evacuation plans and a refusal to do so can be based on any reason or no reason. It is quite another matter, however, for a local government affirmatively to obstruct the information gathering process of the NRC for a reason that lies within the NRC's congressionally-mandated sphere of authority. *See Citizens,* 604 F.Supp. at 1094.

■ Nor is the controversy moot as against the United States because the County's February 7 notice of disapproval will not apply to the federal officials involved in the test. To the extent that Local Law 2–86 interferes with LILCO's ability to participate in the test or persuades LILCO to cancel the test, then the Local Law interferes with the federal government's ability to monitor LILCO and evaluate the utility's performance. The Court therefore concludes that LILCO has a likelihood of success on the merits and is entitled to a preliminary injunction. Because the Court decides that Local Law 2–86 is preempted by federal law, the Court takes no position on the merits of the other arguments in LILCO's complaint.

■ Accordingly, it is hereby ordered that until further order of the Court, the defendants, their agents, employees, officers, and all other persons or entities acting in concert with defendants or on their behalf, are preliminarily enjoined and restrained from initiating or causing to be initiated any proceeding to enforce any of the criminal sanction provisions of Suffolk County Local Law 2–86 by reason of any

conduct or participation in or in inconnection with LILCO's Radiological Emergency Response Plan for the Shoreham nuclear power plant.

SO ORDERED.