UNITED TRANSPORTATION
UNION, Plaintiff,

v.

GRAND TRUNK WESTERN
RAILROAD COMPANY,
Defendant.

No. 88-CV-73971-DT.

United States District Court,
E.D. Michigan, S.D.

April 20, 1989.

C. Thomas Wilson, Detroit, Mich. and
Clinton J. Miller, III, Cleveland, Ohio, for
plaintiff.

Ronald M. Johnson and Brett A. Perl-
man, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

ZATKOFF, District Judge.

### INTRODUCTION

Plaintiff, United Transportation Union
(UTU), has brought this action seeking to
compel the defendant, Grand Trunk West-
ern Railroad Company (GTW), to continue
to participate in national bargaining.
Plaintiff seeks both declaratory and injunc-
tive relief. Presently before the Court is
defendant's Motion to Dismiss or in the
alternative for Summary Judgment.

### I. DISMISSAL

Defendants address their motion to dis-
miss under Fed.R.Civ.P. 12(b)(6). A motion
to dismiss for failure to state a claim under
Rule 12(b)(6) tests the legal sufficiency of
the Plaintiff's Complaint. *Davey v. Tom-
linson*, 627 F.Supp. 1458, 1463 (E.D.Mich.

1986); *Hudson v. Johnson,* 619 F.Supp. 1539, 1542 (E.D.Mich.1985). "In evaluating the propriety of a dismissal under Rule 12(b)(6), the factual allegations in the complaint must be treated as true." *Janan v. Trammell,* 785 F.2d 557, 558 (6th Cir.1986); *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984). Plaintiff's claims shall not be dismissed unless it is established that plaintiff cannot prove beyond doubt any set of facts to support its claim that would entitle plaintiff to relief. *Janan,* 785 F.2d at 558. In a 12(b)(6) motion the Court does not look beyond statements in the Complaint. In the case at bar, however, it is necessary for the Court to consider extraneous matters. Therefore, defendant's alternative request for relief, summary judgment, will be decided.

## II. SUMMARY JUDGMENT

■ Summary judgment is appropriate where no genuine issue of material fact remains to be decided and the moving party is entitled to judgment as a matter of law. *Blakeman v. Mead Containers,* 779 F.2d 1146 (6th Cir.1986); Fed.R.Civ.P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986). In applying this standard, the Court must view all materials offered in support of a motion for summary judgment, as well as all pleadings, depositions, answers to interrogatories, and admissions properly on file in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Cook v. Providence Hosp.,* 820 F.2d 176, 179 (6th Cir.1987); *Smith v. Hudson,* 600 F.2d 60 (6th Cir.1979), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

In deciding a motion for summary judgment, the Court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. Although summary judgment is disfavored, this motion may be granted when the trial would merely result in delay and unneeded expense. *Poller v. Columbia Broadcasting Systems, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *A.I. Root Co. v. Computer/Dynamics, Inc.,* 806 F.2d 673, 675 (6th Cir.1986). Where the non-moving party has failed to present evidence on an essential element of their case, they have failed to meet their burden and all other factual disputes are irrelevant and thus summary judgment is appropriate. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

## III. BACKGROUND

Defendant GTW, a small Class 1 railroad with its headquarters in Detroit, Michigan, operates approximately 943 miles of railroad in the states of Indiana, Illinois, Michigan and Ohio. The present GTW is the product of a merger, and includes the original GTW and the former Detroit, Toledo & Ironton Railroad (DTI) and the former Detroit, Toledo & Shoreline Railroad (DTSL). GTW is the successor to collective bargaining agreements between plaintiff, UTU and each of the merged railroads.

The plaintiff, UTU, represents GTW's employees who work in the crafts or classes of conductors, brakemen and yardmasters. The UTU has subunits, known as General Committees of Adjustment, which are headed by General Chairmen. Five different UTU General Committees have jurisdiction over GTW's UTU-represented employees. The Brakemen and Conductors

Road General Committee of Adjustment has jurisdiction over brakemen and conductors who work on road crews on rail lines of the premerger GTW. A road crew typically operates trains between cities or rail yards. The Grand Trunk Yard Committee has jurisdiction over brakemen and conductors who work on yard crews on lines of the premerger GTW. The yard crew operates trains within the limits of a rail yard or switching district. The General Grievance Committee of Adjustment represents employees in road and yard service who work on lines of the former DTI. The General Committee of Adjustment has jurisdiction over road and yard brakemen and conductors who work on lines of the former DTSL. The Yardmaster's Department of the UTU represents the yardmaster's craft on the GTW, DTI and DTSL. The yardmasters, formerly an independent union, has merged into UTU.

## IV. DISCUSSION

 Collective bargaining agreements have no fixed termination date, but become amendable upon expiration of a contract moratorium. At that time, both parties to the agreement become free to serve notices under Section 6 of the Railway Labor Act, 45 U.S.C. § 156, and make proposed changes in the existing collective bargaining agreement. Collective bargaining can either be multi-employer bargaining, where a group of employers bargain with a union, or individual bargaining, where a single employer and a union bargain. Although railroads have historically bargained in multi-employer groups, the form of such multi-employer bargaining has changed over time. Prior to 1972 most railroads bargained in regional groups because those groups best served the practical and economic needs of railroads. More recently, a single bargaining agent has represented Class 1 railroads in multi-employer bargaining and such bargaining has been in the form of national bargaining.[1] Those railroads and unions desiring to participate in

national bargaining for any round of bargaining give their power of attorney to their respective bargaining agents. For the railroads, the bargaining agent has been the National Railway Labor Conference (NRLC) through its National Carriers Conference Committee (NCCC). The NCCC is comprised of all representatives of each of the major Class 1 railroads and a single representative for smaller carriers, such as GTW. (See Affidavit of Emerson M. Bouchard, pages 3–4).

## A. CURRENT GTW NEGOTIATIONS

GTW has in the past participated in national bargaining, which usually occurs every three or four years when railroad collective agreements are subject to renegotiation. At the beginning of prior rounds of national bargaining, GTW has given its written power of attorney to the NCCC to act on its behalf. The most recent national collective bargaining agreements between the NCCC, on behalf of participating carriers, including GTW, and the UTU and Yardmasters were executed, respectively, October 31, 1985 and June 15, 1987, and became amendable on April 1, 1988.

In the present case GTW decided not to participate in national bargaining with other Class 1 railroads. Consequently, GTW did not give a power of attorney to the NCCC and advised Charles Hopkins, Chairman of the NRLC, of its decision not to participate in national bargaining. GTW served Section 6 notices on each UTU General Chairman on April 4, 1988, proposing changes in its collective bargaining agreements. GTW Section 6 notices, including those addressed to the UTU General Committees, advised that "the carrier intends to conduct negotiations in connection with this notice on its own behalf. GTW is not authorizing a national conference committee to represent us in these negotiations."

The General Chairman in each of the five UTU general committees acknowledged receipt of GTW's Section 6 notices and

---

1. The parties have not given a precise definition of "national bargaining," also referred to as "national handling." It appears that national bargaining is the practice of bargaining between the nation's railroads and their employees on a nationwide, multi-employer basis, rather than engaging in carrier by carrier local negotiations.

agreed to meet with GTW and discuss those notices, without prejudice to their position that national bargaining was required. A GTW labor relations representative met with all GTW unions, including the five UTU General Committees, over the matters raised by GTW's Section 6 notices. GTW met with General Chairmen Roberts and Thompson on April 19, 1988, and with General Chairmen Twyford, Criswell and Miller on April 26, 1988. GTW further met with General Chairmen Twyford and Criswell on May 24, 1988 to discuss GTW's bargaining proposals. Subsequent to these initial meetings, General Chairmen Criswell and Twyford served GTW with Section 6 notices on July 25, 1988, proposing their own modifications in the parties agreements.

It is alleged by GTW that it reached agreement on new labor contracts on July 19, 1988 with General Chairman Thompson, who represents the Yard Crews of the premerger GTW, and General Chairman Roberts, who represents Road and Yard Crews of the former DTI. It is further alleged by GTW that these agreements were ratified by the rank-and-file members of the General Committees, and their terms have been put into effect on GTW. UTU disputes these allegations. In any event, UTU has filed suit seeking to enjoin GTW from further negotiations on a local level and to force them to participate in national handling. UTU alleges that GTW has violated the Railway Labor Act (Act), by refusing to participate in national handling of the present contract negotiations. Plaintiff argues that national handling for purposes of negotiating a new collective bargaining agreement, under the circumstances here, is obligatory under the Act.

## V. LAW AND ANALYSIS

■ Under the Act, both carriers and their employees have a duty to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions" in order to avoid any interruption to commerce. 45 U.S.C. § 152 First. By giving notice pursuant to 45 U.S.C. § 156 ("Section 6 Notice"), either party can propose a change in their agreement. Under the Act, both carriers and employees have the right to designate their own representatives for bargaining:

Representatives, for the purposes of this chapter shall be designated by the respective parties without interference, influence or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives.

45 U.S.C. § 152, Third.

The language of the Act explicitly guarantees each party's right to select its own representative "without interference, influence or coercion." 45 U.S.C. § 152 Third. Therefore, under the Act, GTW cannot be forced to designate the NRLC to negotiate on its behalf. Indeed, GTW was free to bargain on its own behalf.

■ Having concluded that GTW is free to bargain on its own behalf, the question left to be resolved is whether it is "obligated" to participate in national handling. In other words, is GTW obligated to bargain with a coordinated labor bargaining representative such as the Cooperating Railway Labor Organization (CRLO) as well as with the NRLC?

The leading case dealing with the issue of obligatory national handling is *Brotherhood of Railroad Trainmen v. Atlantic Coastline Railroad Company*, 383 F.2d 225, 229 (D.C.Cir.1967), *cert. denied* 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968). In that case, the district court held that the Act authorized a group of carriers to insist upon national handling of negotiations over the issue of "crew consist." After examining the history of bargaining over that issue, the D.C. Circuit reversed, holding that national handling was not obligatory. The court explained:

The Railway Labor Act does not universally and categorically compel a party to a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. *Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on*

*that point* and of the historical experience in handling any similar national movements. The history and realities of crew consist bargaining in this industry impel the conclusion that mass handling was not required by the statute for bargaining on that issue. (Emphasis added). *Id.* at 229.

This language, according to UTU, means that when issues are practically suited for multi-employer bargaining and there exists a tradition of resolving such issues on a multi-employer basis, the issues *must be* handled on a national basis. (Emphasis added). UTU then goes on to cite a list of cases in which various courts found that issues such as wages, health and welfare, vacation and jury duty were required to be dealt with on a national multi-employer basis. See *Chicago, Burlington & Quincy R.R. v. Railway Employees' Department*, 301 F.Supp. 603 (D.D.C.1969); *Delaware & Hudson Ry. Co. v. United Transportation Union*, 450 F.2d 603 (D.C.Cir.), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed. 2d 689 (1971); *United Transportation Union v. Burlington N. Inc.*, 325 F.Supp. 1125 (D.D.C.1971).

A review of these cases, however, reveals that courts have found national handling to be obligatory only after the parties had commenced national bargaining and then one attempted to withdraw or take action inconsistent with the national handling. In the case at bar, GTW notified the UTU subunits of its intention to bargain locally before national bargaining commenced.

A case similar in fact to this case was recently decided in the United States District Court in Minnesota; *American Railway and Airway Supervisors Association v. Soo Line Railroad Co.*, 690 F.Supp. 802 (D.Minn.1988), *appeal pending*, No. 88–5350 MN (8th Cir. docketed August 23, 1988). In *Soo Line,* a rail labor organization brought action on behalf of its members seeking to compel the railroad to continue to participate in national bargaining. The railroad filed a counterclaim asserting that the unions violated the Railway Labor Act by refusing to negotiate directly with

the railroad. The court held that the railroad, which notified the unions of its intention to bargain locally, before national bargaining commenced, was not required to engage in national handling of health and welfare plans. In so holding, the court stated: "no decision has been identified that required a party to engage in national bargaining under similar circumstances. The Act itself fails to recognize or address the issue of national handling in any fashion whatsoever." *Id.* at 807. The court added that the statutory silence and the lack of precedent imposing national handling under similar circumstances enforced its decision not to impose national handling. *Id.*

In the case at bar, UTU fails to cite any statutory or judicial authorities mandating that GTW participate in national bargaining. While UTU's complaint alleges GTW violated Section 2, First, of the RLA, 45 U.S.C. 152, First, by refusing to bargain with UTU on a national basis, UTU does not identify any language in Section 2, First, requiring such bargaining. UTU relied solely on an old line of cases arising in D.C. Circuit. Contrary to UTU's assertion, none of those cases held that "a union is free to decline local negotiations and to insist that the dispute be resolved on a nationwide, multiemployer basis."

The Court finds it interesting to note that two factors cited by the Atlantic Coastline dicta, "practical appropriateness of mass bargaining" and "historical experience," have been undercut by the changing structure of the railroad industry after passage of the Staggers Rail Act of 1980, which required that railroads operate in a more competitive environment. Public Law No. 96–448, 96th Congress, 1st session, 1980. Prior to passage of the Staggers Act, railroads could collectively agree on railroad rate increases, which would go into effect if approved by the Interstate Commerce Commission (ICC). Typically, after agreeing to a national wage increase with their unions, railroads would apply to the ICC for approval to flow the cost of the wage increase through to shippers in a general rate increase. *See, e.g.,* General

Increase, Bulk Carriers Conference 353 ICC 24, 29 (1978) (considering wages and health and welfare benefits costs); Increases In Freight Rates 1973, 346 ICC 305 (1973) (considering increase costs to offset retirement tax increase). The Staggers Act, however, fazed out collective rate setting and required that railroad rates be individually set by railroads. Public Law No. 96–448, Section 219, codified at 49 U.S.C. § 10706 (1980). See also, e.g., H.Conf.R.Rep. No. 96–1430, 96th Cong., 2nd Session, 113–14 (1980), U.S.Code Cong. & Admin.News 1980, p. 3978. Congress clearly contemplated that railroads would have greater individual freedom to determine their own cost structures, including labor costs. *See, e.g.,* H.R.Rep. No. 96–1035, 96th Cong., 2nd Session, 42–43, 119–21 (1980). Because labor costs are a significant component of costs, requiring national bargaining would be inconsistent, not only with the Railway Labor Act, but with the goals of the Staggers Act. Accordingly, even if the D.C. Circuit's dicta could be given the meaning UTU's desires, this Court finds that national bargaining under the circumstances of this case is no longer "practically appropriate."

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment is hereby GRANTED. Plaintiff's request for injunctive relief is DENIED.

IT IS SO ORDERED.