**ALTON & SOUTHERN RAILWAY CO., et al., Plaintiffs,**

v.

**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES, Defendant.**

Civ. A. No. 94-2365.

United States District Court, District of Columbia.

April 28, 1995.

Ralph Jos. Moore and Dorothy Eugenia Langan, Shea & Gardner, Washington, DC, for plaintiffs.

John O'B. Clarke, Highsaw, Mahoney & Clarke, Washington, DC, for defendant.

*MEMORANDUM OPINION*

THOMAS F. HOGAN, District Judge.

Pending before the Court is the plaintiffs' Motion for a Preliminary Injunction. The plaintiffs assert that a preliminary injunction is necessary in order to prevent a strike by members of the defendant Brotherhood of Maintenance of Way Employes ("BMWE") against one or more railroads. This motion has been fully briefed by the plaintiffs and the BMWE and the Court conducted a hear-

ing on April 26, 1995. After carefully considering the testimony of the witnesses at the hearing, the parties' briefs, arguments, exhibits, depositions, affidavits, declarations, and other submissions, the Court finds that it is appropriate to issue a preliminary injunction. Accordingly, the Court will enjoin the BMWE from engaging in any form of self help, including strikes against one or more of the plaintiffs, until this Court has ruled upon the plaintiffs' request for a permanent injunction pursuant to the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* ("RLA").

## I. BACKGROUND

The plaintiffs are a group of 29 rail common carriers. The defendant BMWE is a union representing workers employed by the plaintiff carriers. The parties are currently embroiled in a dispute related to the ground rules for the current round of collective bargaining. Although the background of this particular case is not extraordinarily lengthy, the Court would be remiss if it failed to acknowledge that the relationships between the rail carriers and their workers have often been quite strained. The background of any single railway labor dispute cannot be viewed in a vacuum. Rather, the origins of this matter (as well as many other disputes) can probably be traced back prior to 1894, when Eugene V. Debs led members of the American Railway Union in a turbulent strike against the Pullman Palace Car Company of Illinois. Although the parties' tactics may have changed in the intervening century, carriers and railway unions still have difficulty reaching amicable settlements of their disputes. Thus, a federal court once again has been called upon to step in and determine the legality of a potential strike by railroad workers.

The seeds for the instant case were planted at the conclusion of the 1988 round of collective bargaining between the parties. During that round of bargaining, the BMWE and several other unions were unable to reach agreements with the carriers. After the parties failed to settle their differences, the President of the United States created Presidential Emergency Board No. 219 ("PEB 219") to investigate and report on the disputes. After conducting its investigation, PEB issued a report, which contained a series of recommendations. While some unions reached settlements, others, including the BMWE, instituted a strike on April 17, 1991. On the following day, Congress stepped in and ended the strike by enacting Pub.L. No. 102–29, 105 Stat. 169 (1991). As a result of the action of Congress and the Special Board created by Pub.L. No. 102–29, the BMWE entered into an imposed agreement with the carriers. The BMWE was not pleased with the imposed agreement. Accordingly, the BMWE has attempted to devise a means to avoid another congressionally-imposed agreement.

The imposed agreement contained a moratorium period until November 1, 1994, for filing new § 6 notices of proposed changes in rates of pay, rules, and working conditions.[1] Prior to November 1, 1994, the plaintiff carriers designated the National Carriers' Conference Committee ("NCCC") to act as their authorized national multi-employer bargaining agent to represent them in negotiations with railway labor unions, including the BMWE.[2] However, on October 27, 1994, Mac A. Fleming, the national President of the BMWE, sent a letter to the carriers informing them that the BMWE had decided not to participate in multi-employer bargaining. Instead, the BMWE intended to bargain with each individual carrier. By rejecting multi-employer bargaining, the BMWE sought to avoid a national emergency that might prompt Congress to once again inter-

---

**1.** Notices of intended changes in agreements affecting rates of pay, rules, and working conditions are commonly referred to as § 6 notices because the procedures relating to these notices are described in § 6 of the RLA, 45 U.S.C. § 156.

**2.** Multi-employer bargaining refers to situations where more than one railroad carrier designate the same representative for collective bargaining purposes. Under this system, a union ordinarily negotiates one agreement that covers workers on all of the carriers that have chosen to bargain as a group. This is also called national handling. The Court will use these terms interchangeably throughout this Memorandum Opinion. The alternative to national handling is local handling. Local handling refers to bargaining between a union and a single carrier.

vene and impose an agreement on the parties.

On November 1, 1994, the carriers served § 6 notices upon the BMWE suggesting proposed changes in wages, health and welfare benefits, and work rules. The carriers sought to bargain on a multi-employer basis. On the same day, the BMWE served § 6 notices upon the individual carriers and also proposed a variety of changes in wages, health and welfare benefits, and work rules. However, the BMWE sought to bargain with each carrier on an individual basis. The BMWE's § 6 notices were nearly identical and indicated that no agreement could be final until approved by President Fleming of the BMWE.[3]

Anticipating that the BMWE would be attempting to avoid multi-employer bargaining, the carriers filed the instant lawsuit on November 1, 1994. The carriers seek, *inter alia*, a declaratory judgment declaring that the BMWE is obligated to bargain on a national-handling basis with the NCCC with respect to the issues raised in the current round of collective bargaining, an injunction ordering the BMWE to bargain on a national-handling basis with the NCCC, and an injunction enjoining the BMWE from engaging in premature self help activities. The BMWE and its individual General Chairmen have filed a counterclaim against the carriers seeking a declaratory judgment declaring that the carriers are violating the RLA by refusing to meet with the BMWE's individual bargaining representatives and failing to exert every reasonable effort to resolve the disputes. The BMWE also seeks a declaratory judgment declaring that the carriers' insistence upon multi-employer bargaining interferes with its right under the RLA to designate its bargaining representatives. Additionally, the counterclaimants also seek an injunction enjoining the plaintiffs from interfering with the BMWE's right to designate its bargaining representatives.

Although nearly six months have passed since the parties filed their § 6 notices, no bargaining has taken place. The parties on both sides appear to blame their opponents for this situation. The carriers assert that the BMWE's refusal to bargain on a multi-employer basis violates the RLA's requirement to "exert every reasonable effort" to reach an agreement. 45 U.S.C. § 152 First. The BMWE argues that the RLA gives it the right to decline to participate in multi-employer handling. It asserts that the carriers are violating their obligation not to interfere with the BMWE's selection of its bargaining representatives under the RLA. 45 U.S.C. § 152 Third. Additionally, the BMWE argues that the carriers are the ones violating the RLA's requirement that the parties "exert every reasonable effort" to reach an agreement. 45 U.S.C. § 152 First.[4]

In January of 1995, the carriers and the BMWE both filed cross-motions requesting a preliminary injunction. The carriers sought a preliminary injunction requiring the BMWE to bargain with them on a multi-employer basis. The BMWE sought a preliminary injunction enjoining the carriers from refusing to bargain on a local basis. After reviewing the parties' thorough briefs and hearing oral argument on these motions, the Court denied both requests for injunctive relief in a Memorandum Opinion filed on February 21, 1995.[5] *Alton & Southern Rail-*

---

3. Although the Court refers to the notices served on November 1, 1994, as § 6 notices, the Court is not making any express finding as to whether the notices served by the parties complied with § 6 of the RLA.

4. The parties do not appear to have even been able to sit down together to discuss a possible framework for negotiating a collective bargaining agreement. The carriers apparently have proposed that the parties hold non-prejudicial "double track" meetings in which the parties would negotiate on both an individual and a multi-employer basis. However, the BMWE has rejected this proposal because it does not want to get drawn into any type of multi-employer bargaining.

5. The Court also denied the BMWE's request to transfer this case to the Eastern District of Michigan. Shortly after the carriers filed the instant lawsuit, the BMWE and another union attempted to bring similar litigation in other federal courts that had more favorable RLA precedents. Judge Rosen of the United States District Court for the Eastern District of Michigan ruled that this Court, where the first case was filed, should determine the appropriate venue for the disputes over multi-employer bargaining. *International Brotherhood of Locomotive Engineers v. Consoli-*

*way Co. v. Brotherhood of Maintenance of Way Employes,* Civil Action No. 94-2365, 1995 WL 338544, at *1-3, 1995 U.S. Dist. LEXIS 2740, at *4-6 (D.D.C. February 21, 1995). The Court rejected the carriers' argument that national handling can always be compelled and also rejected the BMWE's argument that national handling is always voluntary because both positions conflicted with the holding of *Brotherhood of R.R. Trainmen v. Atlantic Coast Line R.R. Co.,* 383 F.2d 225, 229 (D.C.Cir.1967), *cert. denied,* 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968). Relying on *Atlantic Coast Line,* the Court found that the RLA does not necessarily compel national handling of all issues, but may compel national handling of certain issues. The Court thus found that neither party had demonstrated a substantial likelihood of success on the merits and that there was no risk that either the carriers or the BMWE would be irreparably injured in the absence of injunctive relief. The BMWE appealed this Court's decision and the Court of Appeals affirmed this Court's ruling on April 25, 1995. *Alton & Southern Railway Co. v. Brotherhood of Maintenance of Way Employes,* No. 95-7042, slip op. at 2, 1995 WL 311450 (D.C.Cir. April 25, 1995).

On March 17, 1995, the carriers filed the motion for a preliminary injunction that is currently before the Court. The carriers seek to enjoin the BMWE from engaging in a strike or any other form of self help until this Court issues a final ruling on the carriers' request for a permanent injunction. In the motion, the carriers assert that any strike would be unlawful because the parties have not exhausted the RLA's long and drawn-out procedures. They also argue that any strike will inflict irreparable harm on the carriers, as well as shippers, commuters, and the public.

In their preliminary injunction motion, the carriers indicate that the BMWE has threatened a strike against plaintiff Consolidated Rail Corporation ("Conrail"). On January 3, 1995, the BMWE General Chairmen on Conrail filed applications for mediation with the National Mediation Board ("NMB"). The NMB did not immediately docket the media-

tion, but began an investigation. Apparently frustrated with the NMB's actions, the General Chairmen withdrew their application on January 31, 1995.

On March 16, 1995, the BMWE General Chairmen on Conrail asked Conrail to begin negotiations with them on March 20 or 21, 1995. On March 20, 1995, the NCCC responded on behalf of Conrail and stated that it was willing to meet with the General Chairmen in order to discuss possible ways that negotiations could proceed, but also indicated that it could not schedule such a meeting until May 5 or 12, 1995. The BMWE General Chairmen did not find this response satisfactory. Thus, on March 21, 1995, they informed Conrail and the NCCC that they considered the RLA conferences on the BMWE's § 6 notices to have been terminated. The BMWE took the position that if Conrail did not request mediation from the National Mediation Board ("NMB") within 10 days, the BMWE could lawfully resort to self help against Conrail. *See Brotherhood of Ry., Airline & S.S. Clerks v. Philadelphia, Bethlehem & N.E. R.R. Co.,* 633 F.Supp. 371, 373 (E.D.Pa.1986) (finding that self help is permitted if neither party requests mediation from NMB within 10 days after conference fails).

On March 30, 1995, carriers applied to the NMB for mediation. The BMWE opposed the carriers' request and asserted that the application was improper because it sought mediation of all the carriers' disputes with the BMWE, rather than only the BMWE's dispute with Conrail. On March 31, 1995, the NMB found that the dispute constituted a "labor emergency" within the meaning of § 5 First of the RLA. 45 U.S.C. § 155 First. The NMB proffered its services to the Conrail dispute as well as the other disputes between the carriers and the BMWE. The NMB specifically stated that it was not determining whether bargaining should take place on a national or local basis. However, it noted that invocation of mediation preserves the status quo under the RLA.

*dated Rail Corp.,* No. 94-CV-74457-DT, slip op. at 13, 1994 WL 808075 (E.D.Mich. December 29, 1994).

## II. DISCUSSION

The RLA was passed "to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions in interstate commerce." *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,* 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). The RLA does not prohibit strikes, but contains a complex set of procedures for delaying strikes over major disputes, such as the formation or revision of collective bargaining agreements, in order to ensure that the parties have a sufficient opportunity to negotiate and mediate their disputes. *Delaware & Hudson Ry. Co. v. United Transp. Union,* 450 F.2d 603, 607 (D.C.Cir.), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971). Under these procedures:

A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10.

*Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).

There is no doubt that the parties have not exhausted these procedures. Although the parties did not initially confer about their disputes, the NMB's decision to proffer its services *sua sponte* provides the parties with an opportunity to begin to exhaust the RLA procedures. Given the fact that the parties' dispute is currently in mediation, it appears at first blush that the BMWE is required to refrain from altering the status quo by striking or resorting to some other means of self help until the RLA's remedies are exhausted. *Id.; Detroit & Toledo,* 396 U.S. at 148, 90 S.Ct. at 298; *Delaware & Hudson,* 450 F.2d at 607. Thus, it would seem that it would be appropriate to grant the carriers' request for an injunction in order to prevent the BMWE from engaging in improper strikes.

### A. THE CARRIERS' STANDING TO SEEK AN INJUNCTION

■ While recognizing that the threatened strike would appear to be illegal, the BMWE argues that the Norris–LaGuardia Act, 29 U.S.C. §§ 101 *et seq.,* deprives the carriers of standing to seek an injunction.[6] The Norris–LaGuardia Act states that federal courts generally do not have jurisdiction to issue injunctive relief in cases involving or growing out of labor disputes. *Id.* § 101. However, the Supreme Court has held that the Act does not deprive federal courts of jurisdiction to enjoin compliance with the mandates of the RLA. *See Burlington Northern R.R. Co. v. Brotherhood of Maintenance of Way Employes,* 481 U.S. 429, 445–446, 107 S.Ct. 1841, 1851, 95 L.Ed.2d 381 (1987) (citing various cases). Despite this exception to the Norris–LaGuardia Act, courts should hesitate to issue an injunction for a violation of the RLA unless injunctive relief alone can effectively guard a plaintiff's rights. *Id.* at 446, 107 S.Ct. at 1851 (citing *International Ass'n of Machinists v. Street,* 367 U.S. 740, 773, 81 S.Ct. 1784, 1802, 6 L.Ed.2d 1141 (1961)).

■ Although apparently conceding that courts may in some instances enjoin violations of the RLA, the BMWE argues that § 8 of the Norris–LaGuardia Act deprives

**6.** At the hearing on April 26, 1995, the BMWE appeared to concede that its standing argument based upon § 8 of the Norris–LaGuardia Act is really the only disputed issue that this Court needs to consider in determining whether to issue a preliminary injunction against the threatened strikes. Inj. Hr'g Tr. at 41.

the carriers of standing to request an injunction because the carriers have failed to comply with their obligation to bargain under the RLA and have failed to make every reasonable effort to settle this dispute. *Brotherhood of R.R. Trainmen v. Toledo, Peoria & W. R.R.*, 321 U.S. 50, 56–57, 64 S.Ct. 413, 417, 88 L.Ed. 534 (1944). Section 8 of the Norris–LaGuardia Act prohibits a federal court from issuing an injunction when the party seeking the injunction "has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108. The Court of Appeals has indicated previously that where carriers have failed to comply with their obligations under the RLA, § 8 of the Norris–LaGuardia Act prevents a district court from issuing an injunction against a strike. *Brotherhood of R.R. Trainmen v. Akron & Barberton Belt R.R. Co.*, 385 F.2d 581, 613–614 (D.C.Cir.1967), *cert. denied*, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968). The BMWE asserts that Conrail has violated its obligations under § 2 First of the RLA by refusing to bargain with the BMWE on a local basis. The BMWE further argues that this refusal to bargain locally also indicates that the carriers have not made every reasonable effort to settle this dispute. The carriers, of course, assert that they do have standing to obtain injunctive relief.

The Court notes that this issue of standing appears to be closely tied to the merits. The parties have both presented substantial amounts of evidence seeking to demonstrate that their respective interpretations of their obligations under the RLA are correct. The merits are significant because if the BMWE's interpretation of its obligations under the RLA is correct, then the carriers' unreasonable refusal to comply with the RLA's requirement that they accede to local handling may deprive them of standing to seek an injunction. Thus, in order to address the issue of standing, the Court must evaluate the merits of each side's arguments about whether collective bargaining should proceed through national or local handling.

The Court briefly addressed the merits in its Memorandum Opinion of February 21, 1995, but will do so at slightly greater length here. As the Court has previously indicated, the carriers argue that the RLA mandates multi-employer bargaining in this case. The BMWE argues that multi-employer bargaining cannot be mandated and that each carrier must bargain with the BMWE on an individual basis if the BMWE does not consent to multi-employer bargaining. A review of the plain language of the RLA does not provide the Court with a simple answer. Section 1 Sixth's definition of "representative" indicates that a group of carriers may designate a bargaining representative. 45 U.S.C. § 151 Sixth. However, § 2 Third prohibits parties from interfering with the other side's selection of bargaining representatives. 45 U.S.C. § 152 Third. These two sections would appear to conflict where, as here, a group of carriers selects the same bargaining representative and seeks to engage in multi-employer bargaining, but a union does not want to designate a single representative to bargain with all of the carriers.

In 1967, the carriers persuaded Judge Holtzoff to adopt their reading of the RLA in *Atlantic Coast Line R.R. Co. v. Brotherhood of R.R. Trainmen*, 262 F.Supp. 177, 187 (D.D.C.1967). In that case, a group of carriers sought an injunction against a possible strike by arguing that a union had failed to bargain in good faith when it refused to submit to the carriers' request for national handling of crew consist rules. After reviewing § 1 Sixth and § 2 Second of the RLA, Judge Holtzoff stated that "[t]he conclusion seems to follow that a group of carriers may designate a single representative." *Id.* Judge Holtzoff further stated that the RLA "should, therefore, be construed as authorizing and empowering carriers to bargain and negotiate as a group in any labor dispute cognizable under the Railway Labor Act." *Id.* Thus, Judge Holtzoff found that the union had failed to comply with the RLA when it refused to meet and confer with the representative of a group of carriers. *Id.*

The Court of Appeals reversed Judge Holtzoff's ruling in *Atlantic Coast Line*, 383

F.2d at 229. The court rejected the carriers' argument that national handling could always be required and also rejected the union's position that national handling was voluntary. Instead the court adopted an approach suggested in the government's *amicus curiae* brief. Specifically, the court held:

> What constitutes good faith bargaining in the railroad industry is colored by how parties have actually bargained in the past. The Railway Labor Act does not universally and categorically compel a party to a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements. The history and realities of crew consist bargaining in this industry impel the conclusion that mass handling was not required by the statute for bargaining on that issue.

*Id.*

Subsequently, courts in this jurisdiction have applied the *Atlantic Coast Line* test to specific factual disputes. *See Chicago, Burlington & Quincy R.R. v. Railway Employes' Dep't,* 301 F.Supp. 603, 607 (D.D.C. 1969) (Robinson, J.) (granting injunction against strikes by union when union sought to modify national agreement without resorting to national handling where subject matter had historically been handled on a national basis and was still appropriate for national handling); *International Ass'n of Machinists and Aerospace Workers v. National Ry. Labor Conference,* 310 F.Supp. 905, 912 (D.D.C. 1970) (Corcoran, J.) (enjoining selective strike by union when action would defeat continued obligatory national handling), *appeal dismissed,* 463 F.2d 872 (D.C.Cir.1972); *United Transp. Union v. Burlington N., Inc.,* 325 F.Supp. 1125, 1131 (D.D.C.1971) (Parker, J.) (permitting selective strike after obligatory national handling because statutory procedures had been exhausted).

The Court of Appeals has only discussed the *Atlantic Coast Line* standard on one occasion. In *Delaware & Hudson,* the Court of Appeals reversed Judge Pratt's decision to grant a preliminary injunction against a selective strike by a union. 450 F.2d at 633. While the court discussed and disagreed with the reasoning of Judge Corcoran's opinion in *International Ass'n of Machinists,* it did not question the *Atlantic Coast Line* standard or attempt to alter it in any way. Rather, the court stated that "Judge Corcoran correctly understood the import and implication of our *Atlantic Coast Line* ruling." *Id.* at 609. Although the issue of whether national handling can be compelled under the RLA apparently has not arisen again in this circuit in nearly 25 years, it appears to be clear that the *Atlantic Coast Line* test is still the law of our circuit.

The Court recognizes that there is more recent authority from other jurisdictions that appears to suggest that national handling may be purely voluntary. *See American Ry. and Airway Supervisors Ass'n v. Soo Line R.R. Co.,* 690 F.Supp. 802 (D.Minn.1988), *aff'd,* 891 F.2d 675 (8th Cir.1989), *cert. denied,* 498 U.S. 809, 111 S.Ct. 42, 112 L.Ed.2d 19 (1990); *United Transp. Union v. Grand Trunk W. R.R. Co.,* 712 F.Supp. 107 (E.D.Mich.1989), *aff'd,* 901 F.2d 489 (6th Cir.) (per curiam), *cert. denied,* 498 U.S. 815, 111 S.Ct. 55, 112 L.Ed.2d 31 (1990); *United Transp. Union v. Illinois Cent. R.R. Co.,* 731 F.Supp. 1332 (N.D.Ill.1990); *United Transp. Union v. Chicago & Illinois Midland Ry. Co.,* 731 F.Supp. 1336 (C.D.Ill.1990). For example, in *Soo Line,* the Eighth Circuit rejected an attempt by a group of rail labor organizations seeking to compel a railroad to continue to participate in national handling. 891 F.2d at 678–79. The court indicated that the unions' attempt to force the railroad to name the NCCC as its national bargaining representative would violate § 2 Third of the RLA. *Id.* at 678. The court also relied upon principles from the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* ("NLRA"), in finding that the RLA permits parties to withdraw from multi-party bargaining before a round of negotiations begins. *Id.* at 678–79. *See Charles D. Bonanno Linen Serv., Inc. v. NLRB,* 454 U.S. 404, 410–12, 102 S.Ct. 720, 724–25, 70 L.Ed.2d 656 (1982) (under NLRA, parties are free to choose whether or not to engage in multi-party bargaining prior to

start of negotiations). Although the BMWE in this case relies on NLRA principles and this recent authority in other circuits to support its argument that a party cannot be compelled to participate in multi-employer bargaining at the beginning of a collective bargaining round, this Court remains bound by the law of this Circuit.[7] *Cf. United States v. Berroa,* 46 F.3d 1195, 1196–97 (D.C.Cir. 1995) (criticizing district court for giving jury instruction that intentionally departed from settled law of circuit). Thus, the Court reiterates its prior ruling that it must apply the *Atlantic Coast Line* standard to this case.

The parties have pelted the Court with a tsunami of affidavits, declarations, exhibits, and other materials in attempting to assist the Court in its determination as to whether national handling is appropriate under the *Atlantic Coast Line* standard. After wading through the parties' filings and considering the testimony presented at the hearing on April 26, 1995, it appears to the Court that the carriers and the BMWE have generally participated in national handling of issues concerning wages and health and welfare benefits. Inj. Hr'g Tr. at 60 (testimony of Steven V. Powers). In fact, it appears that the BMWE and other unions have frequently requested national handling of these issues in the past. *See, e.g.,* Aff. of Charles I. Hopkins, Jr. at ¶ 49; *Soo Line,* 891 F.2d at 676. It also appears that various work rules have been contested, bargained, and resolved on both a national and a local basis. *See, e.g.,* Hopkins Aff. at ¶¶ 5, 39–45; Second Decl. of Steven V. Powers at ¶¶ 2–7. In seeking to bargain work rules nationally during the current round, the carriers appear to be concerned with improving their economic viability and increasing employee productivity. The BMWE, on the other hand, is particularly concerned about work rules because of the

effect the rules can have on union members' quality of life.

Although the Court is cognizant of each side's concerns in this matter, it is simply unable to find at this time that either side has persuasively demonstrated that its position on the national handling issue is so clear that the other side's position is taken in bad faith. In attempting to demonstrate the historical experience with national handling, the carriers have presented substantial evidence that they have bargained on a multi-employer basis with the BMWE for many years, especially on the issues of wages and health and welfare benefits. *See, e.g.,* Hopkins Aff. at ¶¶ 9–38. They also have presented evidence that suggests that multi-employer bargaining is practically appropriate within the meaning of *Atlantic Coast Line. See, e.g.,* Inj. Hr'g Tr. at 109–112 (testimony of Joshua M. Javits). On the other hand, the union has a good faith basis for its position that a union can unilaterally insist upon local handling. As discussed previously, there is some law in three different circuits that appears to support the BMWE's position. Additionally, the BMWE has presented evidence that Conrail may not have a history of national handling. *See, e.g.,* Second Decl. of Jed Dodd at ¶¶ 2–12. The BMWE has also presented evidence that it is practically inappropriate to bargain over work rules on a multi-employer basis. *See, e.g.,* Inj. Hr'g Tr. at 57–59 (testimony of Steven V. Powers). This matter is further complicated by the parties' apparent agreement that wages, health and welfare benefits, and work rules cannot be separated, but must all be bargained together, either locally or nationally. Inj. Hr'g Tr. at 38–39.

Although it appears that the Court must decide at some point whether the view of the carriers or the BMWE is correct, the Court cannot conclusively determine at this time whether multi-employer bargaining is obliga-

---

**7.** The Court notes that none of the cases in other jurisdictions cited by the BMWE held that the *Atlantic Coast Line* test had been rejected by this circuit in *Delaware & Hudson.* Instead, the courts based their decisions upon other intervening changes in federal law, NLRA principles, and their general disagreement with the *Atlantic Coast Line* test. Additionally, the Court notes that all of the cases in other circuits deal with attempts by unions to compel carriers to submit

to national handling; none deals with attempts by unions to compel local handling. Although there is language in some of these cases suggesting that either a union or a carrier could withdraw from national handling prior to a round of collective bargaining, this factual distinction may be significant in light of the language in § 1 Sixth of the RLA indicating that a group of carriers may designate a single bargaining representative. 45 U.S.C. § 151 Sixth.

tory in this case. Because each side has taken a position that has some basis in fact and law, the Court cannot find that either the carriers or the BMWE is acting unreasonably. At the same time, the Court cannot find that the carriers' position is contrary to the RLA or any other law. The final determination as to which side is correct will have to be made after summary judgment briefing or a trial. In light of the fact that each side has staked out a position that has a basis in law and fact, neither side has violated the RLA by sticking to its legal position pending the resolution of this case. In light of these findings, the Court holds that the carriers have not failed to comply with their obligation to bargain under the RLA and have not failed to make every reasonable effort to settle a dispute. Thus, § 8 of the Norris–LaGuardia Act does not deprive the carriers of standing to seek this injunction.

Even if this Court were to find that the carriers had violated the law or failed to make every reasonable effort to resolve this dispute, an analysis of relevant law indicates that the carriers would nevertheless have standing to seek an injunction in this case. In *Atlanta & W. Point R.R. Co. v. United Transp. Union*, 439 F.2d 73, 80 (5th Cir.), *cert. denied*, 404 U.S. 825, 92 S.Ct. 53, 30 L.Ed.2d 53 (1971), there was a four-year delay between the service of RLA § 6 notices and the carriers' expression of a willingness to negotiate with the union because of other ongoing litigation and a dispute as to the nature of the bargaining. Despite this significant delay, the Fifth Circuit affirmed a district court's injunction against a strike by the union and rejected the union's argument that the injunction was prohibited by § 8 of the Norris–LaGuardia Act. *Id.* at 80–82. The court stated that even assuming that the carriers were solely culpable for the four-year delay, their offer to bargain prior to the strike indicated that the parties had not exhausted RLA procedures. *Id.* at 80. In the instant case, even if the Court found that the carriers had previously refused to bargain, their application for mediation, the NMB's exercise of jurisdiction over the dispute, and the carriers' willingness to participate in the NMB proceedings, would remove any bad faith concerns and would give the carriers standing to seek an injunction.

Further, in *Akron & Barberton*, the Court of Appeals for this circuit indicated that there may be situations where the imperatives of the RLA override § 8 of the Norris–LaGuardia Act. 385 F.2d at 613–14. Thus, a court may take an equitable approach and find that an injunction is proper even though one side does not have completely clean hands, especially if there is a strong public interest involved. Additionally, if it is unclear whether § 8 applies, a court may issue a restraining order to avoid jeopardizing the RLA. *Id.* at 614. Although the Court does not believe that the carriers have unclean hands in this case, it finds that this is the type of unusual situation envisioned by the *Akron & Barberton* court where the compelling public interest in avoiding strikes and allowing mediation to continue would significantly outweigh any unclean hands issue.

In finding that the carriers have standing to seek an injunction, the Court acknowledges that the real issue behind this litigation is the BMWE's concern that its bargaining power is diminished when it bargains on a multi-employer basis. The BMWE has, understandably, come to distrust multi-employer bargaining because it appears to significantly limit its ability to pursue self help when negotiations break down. Although these concerns have only been raised in recent years, they are based upon a problem that has always existed within the RLA. The RLA only permits a party to resort to self help after procedures have been exhausted. This limits a union's ability to rely upon a strike threat to force management's hand during negotiations. The BMWE seems to be troubled by the fact that when a union is forced to bargain on a multi-employer basis, any strike threat raises such disastrous possibilities that the threat collapses from its own weight. A nationwide strike presents such a potent threat to interstate commerce that it immediately will draw Congress's attention to the dispute. The very real threat that Congress will intervene, stop a strike, and impose an agreement essentially removes the strike card from union's hand. Without the strike card, the BMWE is con-

cerned that it is destined to lose every round of collective bargaining because it cannot motivate the carriers to enter into a voluntary and favorable agreement. The BMWE holds out the hope that if it bargains with individual carriers, it will be able to once again rely upon a strike threat as a means of pressuring the carriers to reach favorable agreements while not attracting the ire of Congress.

On the other hand, the carriers prefer national handling because it enhances the uniformity and parity of treatment among workers on different railroads. This limited level of difference in wages and working conditions among the carriers serves to decrease the risk of labor disputes arising out of situations where workers on one carrier receive benefits that workers on other carriers do not receive. The carriers' concern about local handling is that a union could target a weak individual carrier and negotiate a favorable agreement and then use whipsaw strikes or other tactics to pressure other carriers into accepting this agreement.

While the BMWE's desire to enhance its bargaining power may be quite legitimate, its goal of using self help is always going to be limited by the express purpose of the RLA, which is to prevent strikes that interrupt interstate commerce. Every time a major railway union threatens a strike, there is some threat to interstate commerce. Thus, although the parties appear to place great significance on the outcome of this litigation, regardless of whether a union negotiates locally or nationally, they always run the risk that Congress will intervene. This is simply a fact of life under the RLA and the Court is in no position to change it; that is the job of Congress. Similarly, the best remedy for both parties' immediate concerns would be for Congress to amend the RLA to more clearly reflect whether or not national handling can be obligatory in some, or all, situations.

**B. PROPRIETY OF INJUNCTIVE RELIEF**

■ Having found that the carriers have standing to seek an injunction, the Court must now determine whether an injunction is appropriate. In the District of Columbia Circuit, a court must consider four factors in determining whether to grant a request for injunctive relief: (1) the movant's likelihood of success on the merits; (2) the prospect of irreparable injury without injunctive relief; (3) the possibility that injunctive relief would harm other interested parties; and (4) the public interest served by granting the injunctive relief. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). Applying these factors to this case, it is clear that an injunction is warranted.

**1. Likelihood of Success on the Merits**

■ Despite the Court's findings that neither side has acted in bad faith and that the carriers have standing to seek an injunction, these findings do not constitute a determination as to whether the carriers have a substantial likelihood of success on the merits.[8] While *Holiday Tours* analysis would ordinarily require the Court to give an indication as to the carriers' likelihood of success on the merits, the Court finds that it need not make such a finding in this case. Under *Holiday Tours*, "a movant need not always establish a high probability of success on the merits. Probability of success is inversely proportional to the degree of irreparable injury evidenced." *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C.Cir.1985) (per curiam). The parties in this case have stipulated that a strike is imminent and that irreparable injury would occur if the BMWE were to strike against one or more of the carriers. Inj. Hr'g Tr. at 20, 30. Where, as here, there is a high risk of imminent irreparable injury, the Court finds that injunctive relief would be appropriate even if the carriers' likelihood of success on the merits were quite slim. In light of the Court's finding that the carriers have a good faith basis for their position, and thus have at least a slim likelihood of success, this factor does not prevent the Court from granting injunctive relief.

---

8. Nor does the Court's finding that each side's position is taken in good faith necessarily preclude the Court from granting summary judgment in this case. That is a matter that the Court will leave for another day.

### 2. Risk of Irreparable Injury

As the Court indicated *supra*, the parties have stipulated that a strike is imminent and that irreparable injury would occur if the BMWE were to strike against one or more of the carriers. Inj. Hr'g Tr. at 20, 30. In light of this stipulation, the Court has little trouble finding that this factor weighs heavily in favor of granting the carriers' request for injunctive relief.

### 3. Harm to Other Parties and the Public Interest

The imminent threat of a strike against one or more of the nation's rail carriers presents a substantial threat to the public interest. As the Court previously indicated, the purpose of the RLA is to prevent railroad strikes and interruptions to interstate commerce. *Detroit & Toledo*, 396 U.S. at 148, 90 S.Ct. at 298. Where, as here, the public is threatened with a loss of vital rail service and an interruption of interstate commerce long before the disputing parties have exhausted the RLA dispute resolution procedures, there can be little doubt that the public interest lies in enforcing the parties' obligation to maintain the status quo pending the exhaustion of the RLA's remedies. *Id.* As the Court of Appeals stated in its Order affirming this Court's denial of the earlier requests for injunctive relief, "it appears to be in the public's interest to try to resolve the bargaining challenges without altering the status of the parties through a preliminary injunction." *Alton & Southern*, No. 95–7042, slip op. at 2. Here, the Court is faced with a situation where the parties are finally ready to sit down together at a bargaining table with the NMB. If the Court does not enjoin the imminent strike, the status quo will be altered and the parties may refuse to exhaust the RLA's procedures. Because a preliminary injunction is the "only practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements," the Court finds that the public interest weighs strongly in favor of issuing injunctive relief. *Chicago & Northwestern Ry. Co. v. United Transp. Union*, 402 U.S. 570, 583, 91 S.Ct. 1731, 1738, 29 L.Ed.2d 187 (1971).[9]

### III. CONCLUSION

The RLA's provisions are "purposefully long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." *Brotherhood of Ry. & S.S. Clerks v. Florida E. Coast Ry. Co.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966). Because of the parties' differing interpretations of the RLA, months have gone by without any attempts to pursue the RLA's dispute resolution procedures. Now that the NMB has proffered its services, the carriers and the BMWE will at least have an opportunity to sit down and attempt to resolve their differences.[10] Because the RLA's long and drawn out procedures have only just begun, the Court finds that any attempt by the BMWE to alter the status quo by exercising self help would be quite premature, would cause irreparable harm, and would be contrary to the public interest. Accordingly, the Court will grant the carriers' request for a preliminary injunction.

### ORDER

For the reasons expressed in the Court's Memorandum Opinion, it is this 28th day of April, 1995, hereby

ORDERED that Plaintiffs' Motion for a Preliminary Injunction [Docket # 53] is GRANTED; and it is further

ORDERED that the defendant, its divisions, lodges, locals, officers, General Chairmen, agents, employees, members, and all persons acting in concert with any of them, be, and they hereby are, preliminarily enjoined, until the Court acts finally on the plaintiffs' prayer for a permanent injunction,

---

9. The parties have never argued that any individuals would be harmed if this injunction were granted and the Court is aware of no such possible harm. Thus, this factor does not weigh against the issuance of an injunction.

10. The proceedings before the NMB are without prejudice to the parties' positions in this litigation. The Court strongly urges the carriers and the BMWE to bargain in good faith and exert every reasonable effort to resolve their disputes, regardless of whether the disputes are resolved on a local or national basis.

from authorizing, encouraging, permitting, calling, engaging in or continuing any strikes, picketing, work stoppages, or other self help against the plaintiffs relating to the dispute or disputes arising from the § 6 notices served in the round of bargaining that commenced on or about November 1, 1994, before the expiration of thirty days following termination of mediation by the National Mediation Board under § 5 of the Railway Labor Act ("RLA"), and completion of emergency board procedures thereafter if an emergency board is established under § 10 of the RLA; and it is further

ORDERED that the defendant shall make all reasonable efforts to prevent its divisions, lodges, locals, officers, General Chairmen, agents, employees, members, and all persons acting in concert with any of them from engaging in conduct enjoined by this injunction, and shall discipline those who engage in such conduct; and it is further

ORDERED that this preliminary injunction is granted upon the condition that, within 24 hours after this Order issues, a nominal bond in the sum of $1000, or cash in that amount, be filed to make good such damages not to exceed said sum as may be entered or sustained by anyone who is found to be wrongfully enjoined or restrained; and it is further

ORDERED that this preliminary injunction may be served by any person over the age of 18 years selected for the purpose by a plaintiff.